IN THE SUPREME COURT OF THE STATE OF DELAWARE

GREGORY B. MAFFEI, ALBERT
E. ROSENTHALER, MATT
GOLDBERG, JAY C. HOAG,
BETSY MORGAN, GREG
O'HARA, JEREMY PHILIPS,
TRYNKA SHINEMAN BLAKE,
JANE JIE SUN, ROBERT S.
WIESENTHAL, LARRY E.
ROMRELL, J. DAVID WARGO,
MICHAEL J. MALONE, CHRIS
MUELLER, and CHRISTY
HAUBEGGER,

    Defendants Below,
    Appellants,

    and

TRIPADVISOR, INC. and
LIBERTY TRIPADVISOR
HOLDINGS, INC.,

    Nominal Defendants Below,
    Appellants,

    v.

DENNIS PALKON and
HERBERT WILLIAMSON,

    Plaintiffs Below,
    Appellees.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

No. 125, 2024

Court Below:
Court of Chancery of the
State of Delaware


C.A. No. 2023-0449-JTL

Submitted: January 13, 2025
Decided:   February 4, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED.**

Kevin R. Shannon, Esquire, J. Matthew Belger, Esquire, Jaclyn C. Levy, Esquire, Christopher D. Renaud, Esquire, Justin T. Hymes, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *for Appellants Gregory B. Maffei, Albert E. Rosenthaler, Larry E. Romrell, J. David Wargo, Michael J. Malone, Chris Mueller, and Christy Haubegger and Nominal Appellant Liberty TripAdvisor Holdings, Inc.*

Matthew W. Close, Esquire (*argued*), Jonathan B. Waxman, Esquire, O'MELVENY & MYERS LLP, Los Angeles, California, Abby F. Rudzin, Esquire, Asher Rivner, Esquire, O'MELVENY & MYERS LLP, New York, New York, *Of Counsel for Appellants Gregory B. Maffei, Albert E. Rosenthaler, Larry E. Romrell, J. David Wargo, Michael J. Malone, Chris Mueller, and Christy Haubegger and Nominal Appellant Liberty TripAdvisor Holdings, Inc.*

Bradley R. Aronstam, S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, *for Appellants Matt Goldberg, Jay C. Hoag, Betsy L. Morgan, Greg O'Hara, Jeremy Philips, Trynka Shineman Blake, Jane Jie Sun, and Robert S. Wiesenthal, and Nominal Defendant-Below/Appellant Tripadvisor, Inc.*

John A. Neuwirth, Esquire, Evert J. Christensen, Jr., Esquire, Stefania D. Venezia, Esquire, WEIL, GOTSHAL & MANGES LLP, New York, New York, *Of Counsel for Appellants Matt Goldberg, Jay C. Hoag, Betsy L. Morgan, Greg O'Hara, Jeremy Philips, Trynka Shineman Blake, Jane Jie Sun, and Robert S. Wiesenthal, and Nominal Defendant-Below/Appellant Tripadvisor, Inc.*

Gregory V. Varallo, Esquire, Andrew E. Blumberg, Esquire (*argued*), Mae Oberste, Esquire, Daniel E. Meyer, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware, Kimberly A. Evans, Esquire, Lindsay K. Faccenda, Esquire, Robert Erikson, Esquire, BLOCK & LEVITON LLP, Wilmington, Delaware, *for Appellees Dennis Palkon and Herbert Williamson.*

Jeroen van Kwawegen, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York, Jeremy Friedman, Esquire, David Tejtel, Esquire, Christopher Windover, Esquire, Lindsay La Marca, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York, Jason Leviton, Esquire, Nathan Abelman, Esquire, BLOCK & LEVITON LLP, Boston, MA, D. Seamus Kaskela, Esquire, Adrienne Bell, Esquire, KASKELA LAW LLC, Newtown Square, Pennsylvania, *Of Counsel for Appellees Dennis Palkon and Herbert Williamson*.

**VALIHURA**, J.:

*Introduction*

Delaware is privileged to serve as the domicile for many of our nation's corporations and other business entities. But other states are eager to compete by promoting their respective corporate governance regimes. Nevada is one such state and has developed its own business court and statutes.

Here, directors, officers, and stockholders of Tripadvisor, Inc. ("Tripadvisor") and Liberty TripAdvisor Holdings, Inc. ("Liberty TripAdvisor") have determined to change their corporate domiciles from Delaware to Nevada. But not all stockholders supported this decision – in fact, the transactions designed to effectuate this change (the "Conversions") would have been voted down without the Defendant-Controller Gregory Maffei's votes. Plaintiffs are stockholders who argue that the Conversions will provide non-ratable benefits in the form of reduced liability exposure to Defendants – a group comprised of Maffei, who is effectively the controller of Tripadvisor and Liberty TripAdvisor, as well as members of the boards of directors of both corporations. Accordingly, Plaintiffs argue that the Conversions should be reviewed under the entire fairness standard. Defendants vigorously dispute this contention and argue that the business judgment rule applies.

We granted interlocutory review following the Court of Chancery's denial of Defendants' motion to dismiss. The Court of Chancery held that Plaintiffs adequately alleged that Defendants will receive a non-ratable benefit in the form of reduced liability exposure and that the Complaint alleged facts supporting a reasonable inference that the Conversions were not entirely fair. Defendants dispute this conclusion and argue that they

will not receive a non-ratable benefit and, accordingly, the business judgment rule applies. Thus, despite the vigorous debate about whether the variation of state corporate laws is vibrant competition among laboratories of democracy or a race-to-the-bottom of stockholder protections, the issue before us is a narrow one – which standard of review governs the decisions to approve the Conversions?

Approximately two months after oral argument before this Court, Plaintiffs filed a motion to dismiss this case as moot arguing that a transaction recently announced by Defendants, if consummated, would eliminate Maffei's controlling interest in Tripadvisor and Liberty TripAdvisor. Defendants opposed dismissal arguing, among other things, that the proposed transaction has not yet occurred and remains subject to conditions, including approval by the stockholders.

We agree with Defendants that the subsequent events have not rendered this interlocutory appeal moot. As to the merits, we hold that the Court of Chancery erred in determining that Plaintiffs had alleged facts supporting a reasonable inference that the Conversions were subject to entire fairness review. Instead, we hold that the business judgment rule applies.

## I. RELEVANT FACTUAL AND PROECEDURAL BACKGROUND

### A. The Parties

Plaintiffs Below, Appellees, are Dennis Palkon and Herbert Williamson. Palkon is a purported stockholder of Tripadvisor, Inc., and Williamson is a purported stockholder of Liberty TripAdvisor Holdings, Inc.[1]

Defendants Below, Appellants, are Gregory B. Maffei, Albert E. Rosenthaler, Matt Goldberg, Jay C. Hoag, Betsy Morgan, Greg O'Hara, Jeremy Philips, Trynka Shineman Blake, Jane Jie Sun, Robert S. Wisenthal, Larry E. Romrell, J. David Wargo, Michael J. Malone, Chris Mueller, and Christy Haubegger. Maffei serves on the board of Tripadvisor and is the CEO, President, and Chairman of Liberty TripAdvisor. The other defendants are members of either Tripadvisor's board of directors or Liberty TripAdvisor's board of directors. When Plaintiffs filed the action below, Maffei beneficially owned super-voting Series B common stock of Liberty TripAdvisor, constituting 43 percent of Liberty TripAdvisor's voting power.[2] For the sake of their motion to dismiss and this appeal, Defendants do not dispute the allegation that Maffei controls Tripadvisor and Liberty TripAdvisor.[3]

---

[1] App. to Opening Br. at A34 (Verified Amended Complaint [hereinafter: Compl.] ¶¶ 18, 19).

[2] Liberty TripAdvisor has a dual-class capital structure. Its Series A common stock is entitled to one vote per share and its Series B common stock is entitled to ten votes per share. *Id.* at A39 (Compl. ¶ 44). Tripadvisor also has a dual-class capital structure. Its common shares are entitled to one vote per share and its Class B common shares are entitled to ten votes per share. *Id.* at A38 (Compl. ¶ 41). Plaintiffs allege that Maffei "effectively controls Liberty TripAdvisor through personally held supervoting shares, and Liberty TripAdvisor, in turn, controls TripAdvisor through its holdings of supervoting shares." *Id.* at A28 (Compl. ¶ 4).

[3] Opening Br. at 5; *see also Palkon v. Maffei*, 311 A.3d 255, 264 (Del. Ch. 2024). As discussed further herein, we recognize that Defendants plan to eliminate Maffei's status as a controller in a

Nominal defendants below, Tripadvisor, Inc. and Liberty TripAdvisor Holdings, Inc., are Delaware corporations. Tripadvisor is headquartered in Massachusetts and operates the world's largest travel guidance platform. Liberty TripAdvisor is headquartered in Colorado and holds an approximately 21 percent economic interest and a 56 percent voting interest in Tripadvisor.

## B. The Conversion Transactions

### 1. Director Approval of Tripadvisor's Conversion

The Tripadvisor directors first discussed "reincorporating from Delaware to Nevada" in November 2022.[4] Management materials circulated to the Board in advance of the meeting presented purported advantages of a conversion "including, but not limited to the following: Directors and officers of [Nevada corporations] may enjoy a higher level of protection against personal liability; Nevada has business courts that minimize the time, cost and risks of commercial litigation; and Nevada has lower taxes and fees."[5] Management also noted that "Legal is evaluating the benefits against any potential issues or risks and the potential cost savings against the anticipated cost to re-incorporate and will report back to the Board."[6]

---

proposed transaction that has not yet been effectuated. *See* Press Release, TripAdvisor, Tripadvisor and Liberty TripAdvisor Announce Planned Merger (Dec. 19, 2024).

[4] App. to Opening Br. at A41 (Compl. ¶ 49).

[5] *Id.* (internal quotation omitted); *see also Palkon*, 311 A.3d at 264.

[6] App. to Opening Br. at A41 (Compl. ¶ 49).

The Board revisited the proposed Conversion in February 2023 as management emphasized the same purported legal advantages.[7]  Materials for the meeting included a presentation noting, among other things, that:

- "[T]he laws of Nevada would generally permit the Company to offer greater protection to its directors and officers."[8]

- Even "in connection with a challenge to an interested party transaction with a controlling shareholder … [t]he Nevada … statutory business judgment rule, not the entire fairness standard, is the sole standard for any analysis involving fiduciary duty claims against corporate directors and officers in Nevada."[9]

- "Delaware courts have significant expertise in dealing with corporate matters and have developed a substantial body of case law interpreting Delaware corporation law. In addition, the Delaware courts have a limited number of judges that hear corporate cases who are all well experienced in corporate law matters.  Because Nevada case law concerning the effects of its statutes and regulations is more limited, and Nevada judges may have less experience in corporate law, the Company and its stockholders may experience less predictability in Nevada courts with respect to corporate matters."[10]

- "[M]arket participants are familiar with the Delaware corporate law regime and may perceive Nevada laws as less developed or predictable."[11]

- "Investors may perceive Nevada corporate law as less responsive to stockholder rights, which may deter certain investors from investing in a Nevada corporation and/or could lead to negative PR."[12]

---

[7] *Id.* at A140–58 (Feb. 2023 Presentation); *see also id.* at A41–43 (Compl. ¶¶ 50, 51).

[8] *Id.* at A143 (Feb. 2023 Presentation); *see also id.* at A42 (Compl. ¶ 51).

[9] *Id.* at A147 (Feb. 2023 Presentation); *see also id.* at A42 (Compl. ¶ 51).

[10] *Id.* at A144 (Feb. 2023 Presentation); *see also id.* at A42 (Compl. ¶ 51).

[11] *Id.* at A144 (Feb. 2023 Presentation); *see also id.* at A42 (Compl. ¶ 51).

[12] *Id.* at A144 (Feb. 2023 Presentation); *see also id.* at A42–43 (Compl. ¶ 51).

The Tripadvisor directors met again on March 23, 2023 to approve the Conversion.[13] There, the Board reviewed a management presentation including the following points:

- The Conversion would "[r]educe the risk of expensive and time consuming litigation against the Company and its directors and officers[.]"[14]

- "Nevada statute-focused law may be less developed and less predictable than the law in Delaware that has been developed by extensive judicial decisions by experienced judges and provides a well-established legal framework."[15]

- "Investors may perceive Nevada corporate law as less responsive to stockholder rights, which may deter certain investors from investing in a Nevada corporation and/or hostile takeover attempts, which may be beneficial to shareholders."[16]

- "Reincorporation by Tripadvisor – simultaneously with an [Liberty TripAdvisor] reincorporation – could cause speculation about future transactions involving Tripadvisor, create uncertainty and lead to negative PR."[17]

The Tripadvisor Board approved the Conversion in substance following the discussion.[18]

### 2. Director Approval of Liberty TripAdvisor's Conversion

The Liberty TripAdvisor directors considered similar factors. Management's March 7, 2023 presentation to the directors included the following purported legal advantages of converting to a Nevada corporation:

- "Recent case law developments in Delaware, in particular with respect to conflicted controller and 'change of control' transactions, have increasingly emboldened plaintiffs' law firms to bring claims against directors and officers, significant

---

[13] *Id.* at A45 (Compl. ¶ 55); *see also id.* at A163–76 (Mar. 23, 2023 Presentation).

[14] *Id.* at A166 (Mar. 23, 2023 Presentation); *see also id.* at A45 (Compl. ¶ 55).

[15] *Id.* at A167 (Mar. 23, 2023 Presentation); *see also id.* at A45 (Compl. ¶ 55).

[16] *Id.* at A167 (Mar. 23, 2023 Presentation); *see also id.* at A45 (Compl. ¶ 55).

[17] *Id.* at A167 (Mar. 23, 2023 Presentation); *see also id.* at A45 (Compl. ¶ 55).

[18] *Id.* at A46 (Compl. ¶ 56). We note that the Presentation also included other purported advantages from the Conversions.

stockholders and the company and have increased potential exposure for these parties";[19]

- "Under Delaware law director liability cannot be eliminated if the court finds a breach of duty of loyalty and D&O carriers often argue duty of loyalty claims are not insured";[20]

- "Cases that are subject to 'entire fairness' review in Delaware (which requires the defendants to demonstrate that the price and process in a transaction were entirely fair) present a high bar and, because of the factual issues involved, it is often difficult for defendants to prevail in the preliminary stages of litigation";[21]

- "Liberty Media [an affiliated public company for which Maffei serves as CEO], its service companies and certain of their portfolio companies have experienced these developments, having been involved in at least 8 stockholder lawsuits in Delaware since 2012 (5 of which were brought in the last 5 years) which have resulted in substantial time and expense to defend and resolve";[22]

- "Management believes Nevada law generally provides greater protection from liability to the Company and its D&Os than Delaware law";[23]

- "Nevada law eliminates the individual liability of both officers and directors to the company, its stockholders or its creditors for damages as a result of a breach of fiduciary duty unless the breach involved intentional misconduct, fraud or a knowing violation of law and unless a company's articles of incorporation provide for greater liability";[24]

- "Nevada does not follow Revlon duties (duty to get the best price reasonably available in a sale), and instead permits consideration of 'other constituencies' by statute[.]"[25]

---

[19] *Id.* at A184 (Mar. 7, 2023 Presentation); *see also id.* at A43 (Compl. ¶ 52).

[20] *Id.* at A184 (Mar. 7, 2023 Presentation); *see also id.* at A43 (Compl. ¶ 52).

[21] *Id.* at A184 (Mar. 7, 2023 Presentation); *see also id.* at A43 (Compl. ¶ 52).

[22] *Id.* at A184 (Mar. 7, 2023 Presentation); *see also id.* at A44 (Compl. ¶ 52).

[23] *Id.* at A187 (Mar. 7, 2023 Presentation); *see also id.* at A44 (Compl. ¶ 52).

[24] *Id.* at A187 (Mar. 7, 2023 Presentation); *see also id.* at A44 (Compl. ¶ 52).

[25] *Id.* at A187 (Mar. 7, 2023 Presentation); *see also id.* at A44 (Compl. ¶ 52).

The presentation acknowledged the potential litigation risk of pursuing this Conversion. The materials noted that Delaware plaintiffs may sue Liberty TripAdvisor's directors for "breach of fiduciary duty for allowing alleged controlling shareholder misconduct to take advantage of Nevada legal framework for self-interest[.]"[26] The presentation also noted uncertainty regarding "Post-Reincorporation Nevada Litigation," stating that "notwithstanding that it is contemplated that the Nevada charter will require that 'internal actions' be brought exclusively in Nevada state courts, there is uncertainty as to whether Delaware and federal courts would enforce that requirement."[27]

After discussion, Liberty TripAdvisor management agreed to continue to pursue the proposed reincorporation and to follow up with the Board for formal approval at a later date. On April 5, 2023, the Liberty TripAdvisor Board approved the Conversion by unanimous written consent.

*3. The Stockholder Votes on the Conversions*

Both corporations distributed proxy statements in advance of the stockholder votes on the Conversions. Tripadvisor's "Reasons for Redomestication" disclosed the following among several reasons:

- "[T]he Redomestication will provide potentially greater protection from unmeritorious litigation for directors and officers of the Company."[28]

---

[26] *Id.* at A186 (Mar. 7, 2023 Presentation); *see also id.* at A44 (Compl. ¶ 53).

[27] *Id.* at A186 (Mar. 7, 2023 Presentation); *see also id.* at A44 (Compl. ¶ 53).

[28] *Id.* at A263 (Tripadvisor, Inc., Proxy Statement (Schedule 14A) (Apr. 26, 2023)); *see also id.* at A59 (Compl. ¶ 78).

11

- "The Redomestication will result in the elimination of any liability of an officer or director for a breach of the duty of loyalty unless arising from intentional misconduct, fraud or a knowing violation of law."[29]

- "[W]e believe that, in general, Nevada law provides greater protection to our directors, officers, and the Company than Delaware law.[30]

Liberty TripAdvisor identified similar rationales and disclosed, among other reasons, the following under its "Reasons for the Conversion":

- "We believe that . . . Nevada law generally provides greater protection against liability for our directors, officers and the company than Delaware law."[31]

- "The conversion will therefore result in the elimination of liability of an officer or director for breaches of fiduciary duties to the company, including its stockholders unless, [sic] involving intentional misconduct, fraud or knowing violation of law."[32]

Assuming Maffei and Liberty TripAdvisor voted all their shares in favor, only 5.4 percent of minority Tripadvisor and 30.4 percent of Liberty TripAdvisor's minority stockholders voted for the Conversions.[33] Therefore, the Conversions would not have been approved without the votes of Maffei and Liberty TripAdvisor. However, with Maffei and Liberty TripAdvisor's votes included, the Conversions were approved by a majority of each corporation's voting power at their respective annual meetings in June 2023.[34]

---

[29] *Id.* at A263 (Tripadvisor, Inc., Proxy Statement (Schedule 14A) (Apr. 26, 2023)); *see also id.* at A59–60 (Compl. ¶ 79).

[30] *Id.* at A263 (Tripadvisor, Inc., Proxy Statement (Schedule 14A) (Apr. 26, 2023)); *see also id.* at A60 (Compl. ¶ 79).

[31] *Id.* at A236 (Liberty TripAdvisor Holdings, Inc., Proxy Statement (Schedule 14A) (Apr. 21, 2023)); *see also id.* at A60 (Compl. ¶ 80).

[32] *Id.* at A236 (Liberty TripAdvisor Holdings, Inc., Proxy Statement (Schedule 14A) (Apr. 21, 2023)); *see also id.* at A60 (Compl. ¶ 80).

[33] *Id.* at A63–64 (Compl. ¶ 86); *see also Palkon*, 311 A.3d at 266.

[34] App. to Opening Br. at A63–64 (Compl. ¶ 86).

## C. Proceedings in the Court of Chancery

### 1. Events Preceding the Court of Chancery's Decision

On April 21, 2023, Plaintiffs filed a Verified Complaint, Motion for Expedition, and a Motion for a Preliminary Injunction seeking to enjoin the redomestication of Tripadvisor and Liberty TripAdvisor into Nevada entities (the "Conversions").[35] On May 1, the Court of Chancery issued a Stipulation and [Proposed] *Status Quo* Order noting that, among other things, "the parties have stipulated and agreed as follows:

> 1. [Tripadvisor] and Liberty TripAdvisor are entitled to hold stockholder votes on the Conversions.
>
> 2. [Tripadvisor] and Liberty TripAdvisor will not effectuate the Conversions until the Court enters an order dismissing the action that is final and non-appealable or by agreement of the parties, subject to the Court approving the termination of this Order. Plaintiffs agree that they will seek to expedite any appeal to the Delaware Supreme Court from an order dismissing the action.
>
> 3. Plaintiffs withdraw their Motion for Expedition and Motion for a Preliminary Injunction as moot."[36]

In June 2023, Plaintiffs filed a Verified Amended Complaint (the "Complaint"), contending that the Conversions were self-interested transactions and that Defendants breached their fiduciary duties by entering into them.[37] They sought to enjoin the closing of the Conversions.[38]

---

[35] *Palkon v. Maffei*, C.A. No. 2023-0449-JTL (Del. Ch. May 1, 2023) (Stipulation and [Proposed] *Status Quo* Order).

[36] *Id.* at 2.

[37] App. to Opening Br. at A68 (Compl. ¶¶ 100, 101); *id.* at A69 (Compl. ¶¶ 104, 105); *id.* at A70 (Compl. ¶¶ 109, 110); *id.* at A71 (Compl. ¶¶ 113, 114). The Verified Amended Complaint was filed in June 2023 and it was the operative Complaint considered by the Court of Chancery.

[38] *Id.* at A72 (Compl. Prayer for Relief); *see also Palkon*, 311 A.3d at 266.

In February 2024, Tripadvisor announced that it had entered into discussions with Liberty TripAdvisor regarding a potential going-private transaction. Tripadvisor also announced that it had formed a special committee and that any transaction would be subject to the twin *MFW* protections. No assurances were provided that an agreement would be reached or when a going-private transaction might happen. The court asked the parties whether the announcement had implications for the motion to dismiss. The parties agreed that the potential for a transaction at some point in the future did not have any effect on the pending motion. Both sides asked the court to render a decision.[39]

---

[39] App. to Opening Br. at 266–67. This dialogue between the parties and the court took place through a telephonic status conference. *See Palkon v. Maffei*, C.A. No. 2023-0449-JTL (Del. Ch. Feb. 13, 2024) (TRANSCRIPT) (Telephonic Status Conference). Defendants' counsel argued that "all we have is boards approving parties engaging in the discussion. So we have some ways to go, if it goes anywhere at all." *Id.* at 6:15–17. Plaintiffs' counsel responded that "[w]e don't really necessarily have anything to react to. So we don't have a position on whether it affects the case." *Id.* at 6:21–23. Plaintiffs' counsel also argued that "if the defendants wanted to attempt to close as a Nevada corporation, that might affect the motion itself given some of the arguments defendants made about the impact of a pending transaction on the analysis." *Id.* at 8:12–16.

On November 12, 2024, Plaintiffs filed a letter with this Court informing this Court of comments made by Defendant Maffei during Liberty Broadband's November 7, 2024 earnings call. Pls.' Letter (Nov. 12, 2024). As quoted, Maffei's comments appear to show progress toward a transaction. *Id.* at 2. In the letter, "Plaintiffs contend that the presence of a 'proposed, pending, or contemplated controller transaction' is not relevant to the standard of review for the reasons stated in Plaintiffs' appellate brief and at oral argument." *Id.* at 1. However, Plaintiffs wrote that if this Court "determines that the presence of a 'proposed, pending, or contemplated controller transaction' is relevant to the standard of review, the Court should be aware of [Maffei's comments]." *Id.* at 2.

In a letter filed on November 18 and corrected on November 20, Defendants responded that

> [t]he language that Appellees quote in their November 12, 2024 letter from Liberty Broadband's November 7, 2024 earnings call is consistent with the disclosures already before the Court and reflect continued consideration of strategic alternatives. At this time, it still remains unknown if a transaction agreement will be signed in the future. Equally unknown are the ultimate terms of any such transaction, including whether it could be viewed as a conflicted-controller transaction.

## 2. The Parties' Contentions Below

In their Complaint, Plaintiffs argued that "the Conversions will insulate [the Defendants] from almost any stockholder litigation, including claims that would be highly meritorious under Delaware law."[40] In support of this argument, Plaintiffs claimed that Nevada has been engaged in a project to craft a no-liability corporate safe haven and has become a "hotbed for corporate wrongdoers."[41] Plaintiffs then argued that "[t]he Conversions essentially deprive Plaintiffs and other public stockholders of [the right to sue] without any fair process and without any consideration."[42] Further, Plaintiffs alleged that the market values Nevada firms less than it values Delaware firms.[43] After citing Defendants' proxy materials, Plaintiffs argued that "[a]t bottom, the Conversions are self-interested transactions aimed to benefit the Companies' directors, officers, and conflicted controlling stockholder to the clear detriment of minority public stockholders."[44]

Plaintiffs alleged that Maffei, as a controller, breached his fiduciary duties by entering into a transaction that is not entirely fair to Tripadvisor's and Liberty

---

Defs.' Corrected Letter at 3 (Nov. 20, 2024). Defendants concluded that the comments do not "change the fact that the Complaint, which was filed with the benefit of prior discovery, offers nothing more than speculation about possible future transactions." *Id.*

[40] App. to Opening Br. at A30 (Compl. ¶ 10).

[41] *Id.* (Compl. ¶ 11). Later in the Complaint, Plaintiffs alleged several defendant-friendly aspects of Nevada law including the ability to exculpate directors and officers from certain duty of loyalty breaches, foreclosure of the "inherent fairness standard" in conflicted transactions, and more limited inspection rights. *Id.* at A51–52 (Compl. ¶ 67).

[42] *Id.* at A31–32 (Compl. ¶ 13).

[43] *Id.* at A56–57 (Compl. ¶¶ 73, 74).

[44] *Id.* at A63 (Compl. ¶ 85).

15

TripAdvisor's public stockholders. They also alleged that the directors breached their fiduciary duties by approving the self-interested Conversions to insulate themselves and Maffei from future liability without providing any material consideration to the public stockholders.

Defendants filed a motion to dismiss under Rule 12(b)(6) arguing that the business judgment rule applies because Plaintiffs failed to plead a self-interested transaction.[45] After disputing Plaintiffs' characterization of Nevada law, Defendants argued that:

> In any event, this motion does not ask this Court to evaluate Nevada's legislative choices: The question presented here is whether Nevada's allegedly greater protection from litigation for Maffei and the other Directors constitutes a unique benefit to them sufficient to render the Conversions self-interested transactions. It does not.[46]

Defendants then cited Delaware case law for the proposition that "Delaware courts have found directors to be interested only when approving a transaction that extinguishes *existing* potential liability."[47] According to Defendants, the distinctions between these cases "make[] clear that allegations about protection from potential *future* litigation are insufficient to plead a self-interested transaction."[48] Defendants argued that "Plaintiffs'

---

[45] *Id.* at A104–06 (Opening Brief in Support of Defendants' Motion to Dismiss the Amended Complaint [hereinafter: Motion to Dismiss Opening Br.] at 18–20). Defendants also argued that they "fully complied with Section 266 and should be allowed to complete the Conversions." *Id.* at A103 (Motion to Dismiss Opening Br. at 17).

[46] *Id.* at A107 (Motion to Dismiss Opening Br. at 21). Defendants argued in a footnote that "[p]rinciples of comity alone mandate that Nevada's legislative choices for the administration of its corporate law should be respected, just as Delaware's should be, and render Plaintiffs' critique of Nevada law unavailing." *Id.* (Motion to Dismiss Opening Br. at 21 n.8).

[47] *Id.* at A108 (Motion to Dismiss Opening Br. at 22) (emphasis in original).

[48] *Id.* at A110 (Motion to Dismiss Opening Br. at 24) (emphasis in original).

speculation about a potential future transaction is insufficient to plead self-interest today by Maffei."[49]

Plaintiffs opposed the Motion to Dismiss arguing that the Conversions are subject to entire fairness because they would provide a non-ratable benefit to Maffei and the other directors.[50] Plaintiffs sharply disagreed with Defendants that "a controller obtains a non-ratable benefit only when 'a transaction … extinguishes *existing* potential liability[.]'"[51] Plaintiffs argued further that the scale of the D&O insurance market, corporate lawyers rates, and the very reason Defendants are entering into the Conversions shows that "[i]t defies reality to suggest that Maffei—or any controller—would be indifferent to the risk of future liability for disloyal self-dealing."[52]

### 3. The Court of Chancery's Analysis

Applying the familiar Rule 12(b)(6) standard, the Court of Chancery observed that "[d]ismissal is inappropriate 'unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.'"[53]

---

[49] *Id.* at A115 (Motion to Dismiss Opening Br. at 29).

[50] App. to Answering Br. at B039 (Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss the Amended Complaint [hereinafter: Motion to Dismiss Answering Br.] at 27).

[51] *Id.* at B040 (Motion to Dismiss Answering Br. at 28) (quoting Motion to Dismiss Opening Br. at 22) (emphasis in original).

[52] *Id.* at B042–43 (Motion to Dismiss Answering Br. at 30–31).

[53] *Palkon*, 311 A.3d at 267 (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011)).

The court's analysis of the fiduciary duty claim proceeded in four parts. [54]  *First*, it held that entire fairness would apply if "the conversions conferred a non-ratable benefit on the fiduciary defendants."[55]  *Second*, it held that it was "reasonable to infer from the complaint's allegations that Nevada law provides greater protection to fiduciaries and confers a material benefit on the defendants."[56]  *Third*, it held that the court could conduct an entire fairness inquiry and consider "whether stockholders received the substantial equivalent of what they had before."[57]  And *fourth*, it held that "[t]he plaintiffs have pled facts supporting an inference that the conversions were not entirely fair."[58]

### a.  The Court of Chancery's Standard of Review

The court considered which of three standards of review would apply:  business judgment, enhanced scrutiny, or entire fairness.  Although Defendants contended that the Conversions were protected by the business judgment rule, the court noted that "Delaware

---

[54] The court dispensed with Defendants' statutory compliance argument that dismissal was warranted because the Conversions complied with 8 *Del. C.* § 266.  *Id.* at 267–68.  Defendants had argued that "[t]here is no dispute that Liberty TripAdvisor and Tripadvisor have complied with Section 266:  Each board adopted resolutions approving the Company's Conversion and a majority of each Company's voting power approved that Company's Conversion."  App. to Opening Br. at A102–03 (Motion to Dismiss Opening Br. at 16–17).  Defendants argued further that "[b]y reducing [through amending Section 266] the required approval from unanimity to a bare majority for all corporations seeking to leave Delaware—controlled or otherwise— the legislature chose to allow controlled companies to move without minority support."  *Id.* at A103 (Motion to Dismiss Opening Br. at 17).  The court observed that statutory compliance did not end the inquiry and Plaintiffs' claims required the court to consider whether Defendants complied with their fiduciary duties.  *Palkon*, 311 A.3d at 267–68.

[55] *Palkon*, 311 A.3d at 270.

[56] *Id.* at 277.

[57] *Id.* at 280.

[58] *Id.* at 281.

18

law has deemed the business judgment rule rebutted and applied the entire fairness test *ab initio* to any transaction between the corporation and a controlling stockholder in which the controller receives a non-ratable benefit."[59]  The court noted that the parties agreed that Maffei controlled the corporations and that there were no cleansing actions.  Accordingly, the court held that the standard of review "depends on whether the conversions conferred a non-ratable benefit on the fiduciary defendants."[60]

> b. *The Court of Chancery Found That the Conversions May Convey a Non-Ratable Benefit to Defendants*

The court observed that "[u]nder Delaware law, a controller or other fiduciary obtains a non-ratable benefit when a transaction materially reduces or eliminates the fiduciary's risk of liability."[61]  Although the parties argued that no Delaware decision applied these principles to a reincorporation merger, the court determined that *Harris v. Harris*[62] did just that.[63]  The court noted that the *Harris* defendant sought a reincorporation merger that would change the corporation's domicile from Delaware to New Jersey and, in the process, would extinguish minority stockholders' standing to pursue derivative claims.[64]  Because those claims sought to recover compensation and benefits paid to the director defendant and the Advisors, the defendants were "interested in the litigation."[65]

---

[59] *Id.* at 270.

[60] *Id.*

[61] *Id.*

[62] 2023 WL 115541 (Del. Ch. Jan. 6, 2023).

[63] *Palkon*, 311 A.3d at 270.

[64] *Id.* (citing *Harris*, 2023 WL 115541, at *14).

[65] *Id.* (quoting *Harris*, 2023 WL 115541, at *14).

Accordingly, "[b]ecause the merger extinguished the plaintiffs' standing to pursue those claims, the defendants received a non-ratable benefit from the reincorporation merger."[66]

The court then rejected Defendants' attempt to distinguish *Harris* by differentiating between existing potential liability and future potential liability.[67] The court commented that such a distinction "would make Delaware law piteously naive."[68] It drew an analogy to the insurance industry and considered that "an insurer gets greater benefit from the same dollar value of premium if onerous conditions mean the insurer is less likely to pay."[69] The court further observed that as an insurer receives a benefit when conditions make recovery by the insured more difficult, a change in conditions making it more difficult to recover under corporate law "imposes a detriment on stockholders and confers a benefit on the fiduciaries."[70] The court added that "[i]t does not matter that the events that could give rise to a claim have not happened yet."[71]

The court criticized Defendants' temporal distinction by comparing it with alterations of future dividends and call options. In both cases, the court reasoned that applying the existing versus future distinction would produce results incompatible with market understandings of value.[72]

---

[66] *Id.* at 270–71 (citing *Harris*, 2023 WL 115541, at *14). The Court of Chancery noted that "[t]here is no reason why similar principles of law would not apply to a conversion." *Id.* at 271.

[67] *Id.* at 271.

[68] *Id.*

[69] *Id.*

[70] *Id.* at 272.

[71] *Id.*

[72] *Id.* at 272–73.

Next, the court rejected Defendants' reliance on *Bamford v. Penfold, L.P.*,[73] *Orloff v. Shulman*,[74] *Coates v. Netro Corp.*,[75] and *Sylebra Capital Partners Master Fund, Ltd. v. Perelman*,[76] concluding that these cases support a materiality requirement, rather than a temporal distinction.[77] The court noted that "[a] fiduciary is interested in a transaction when it confers a material benefit on the fiduciary."[78] The court, therefore, interpreted the cases as seeking to determine whether the fiduciary received something that was (i) a benefit; and (ii) was material. In the court's view, the cases treat litigation protection as a benefit and ask whether the litigation protection is material.

The court reasoned that *Bamford* "did not distinguish between existing-potential and future-potential liability[]" and that the exculpatory provision in *Bamford* was material making *Bamford* about a materiality rule – not a temporal distinction.[79] And the court

---

[73] 2022 WL 2278867 (Del. Ch. June 24, 2022), *reargument granted in part*, 2022 WL 3283869 (Del. Ch. Aug. 10, 2022).

[74] 2005 WL 3272355 (Del. Ch. Nov. 23, 2005).

[75] 2002 WL 31112340 (Del. Ch. Sept. 11, 2002).

[76] 2020 WL 5989473 (Del. Ch. Oct. 9, 2020). Defendants argued in their brief below that "[t]his Court found that putting itself above Nevada courts was particularly inappropriate given that Sylebra sought to challenge a potential transaction occurring 'on a future date, when any resulting injury would occur in Nevada, not Delaware.'" App. to Opening Br. at A111 (Motion to Dismiss Opening Br. at 25) (quoting *Sylebra*, 2020 WL 5989473, at *9). Defendants further noted that the court dismissed the plaintiff's complaint in *Sylebra* stating that "'[t]hat scheme, assuming it is in progress as alleged, has not come to fruition. When (or if) it does, the fiduciaries involved will owe duties to a Nevada corporation and its stockholders. . . . Nevada courts are now, and will be, available to Sylebra to adjudicate its claims . . . .'" *Id.* at A112 (Motion to Dismiss Opening Br. at 26) (quoting *Sylebra*, 2020 WL 5989473, at *12).

[77] *Palkon*, 311 A.3d at 273.

[78] *Id.*

[79] *Id.* at 274.

stated that "[t]he same is true with *Orloff*."[80] The court read *Orloff* as turning on a lack of materiality because the Section 102(b)(7) provision at issue "only protected against monetary damages for a breach of the duty of care, and by statute, it could only apply prospectively."[81] The court distinguished *Coates* – a case addressing a plaintiff's challenge to a reincorporation merger from California to Delaware – on the ground that the plaintiff in that case had not pled sufficient facts that the director defendants had breached their fiduciary duties in recommending and approving the redomestication. Specifically, the *Coates* plaintiff "had not sufficiently pled self-interested conduct based solely on the directors' acknowledgment that 'a possible conflict of interest may arise from the greater protections afforded directors under Delaware law.'"[82] Therefore, the court read *Coates* as a case where "[t]he Chancellor declined to credit what he regarded as a 'mere conclusory statement' with no supporting factual predicate."[83] Accordingly, the court did not interpret *Coates* as supporting a temporality requirement; rather, the court considered the case to be about the plaintiff failing "to allege facts supporting an inference that the merger conferred a material benefit on the directors."[84]

---

[80] *Id.*

[81] *Id.* at 275.

[82] *Id.* (quoting *Coates*, 2002 WL 31112340, at *5).

[83] *Id.* (quoting *Coates*, 2002 WL 31112340, at *5). The Court of Chancery in *Coates* stated that "[t]he defendants, in fact, were clear in the proxy statement that a possible conflict of interest may arise from the greater protections afforded directors under Delaware law." *Coates*, 2002 WL 31112340, at *5. However, the court held that "[a] mere conclusory statement that the defendants breached their fiduciary duties is not enough to survive a motion to dismiss." *Id.*

[84] *Palkon*, 311 A.3d at 275.

22

Finally, the court stated that *Sylebra* was inapplicable because that court "refused to address the merits of the plaintiffs' claims and dismissed the case based on the forum-selection bylaw."[85] Thus, the court concluded that "[t]he *Sylebra* decision has nothing to do with the point the defendants are trying to make."[86]

The court also rejected comparisons with *Boilermakers Local 154 Retirement Fund v. Chevron Corp.*[87] and *Underbrink v. Warrior Energy Services Corp.*,[88] which the court said Defendants cited "[i]n passing[.]"[89] The court did not interpret *Chevron* as being about whether the future application of a forum-selection bylaw creates a disqualifying interest.[90] Instead, the court read *Chevron* as a case where the court "declined to consider as-applied challenges based on whether the bylaw might operate unreasonably in future cases."[91] Nonetheless, the court reasoned that forum-selection bylaws do not confer a material benefit on fiduciaries because "[t]he bylaw only changes the forum, not the law or the fiduciaries' litigation exposure."[92]

Finally, the court addressed *Underbrink*. The court noted that *Underbrink* "interpreted *Orloff* as supporting a temporal distinction and put heavy emphasis on that

---

[85] *Id.* at 276 (citing *Sylebra Cap. P'rs Master Fund, Ltd.*, 2020 WL 5989473, at *7, *14).

[86] *Id.*

[87] 73 A.3d 934 (Del. Ch. 2013).

[88] 2008 WL 2262316 (Del. Ch. May 30, 2008).

[89] *Palkon*, 311 A.3d at 276.

[90] *Id.*

[91] *Id.*

[92] *Id.*

23

concept when assessing materiality."[93]   Nonetheless, the court viewed *Underbrink* to ultimately be about "materiality, not temporal orientation."[94]

### c. The Court of Chancery Rejected Defendants' Argument That Applying the Entire Fairness Standard Is Not Feasible

The court began by outlining how it viewed the entire fairness standard.  The court criticized Defendants' argument that it would not be feasible to apply entire fairness.  The court reasoned that "[t]he true 'test of fairness' is whether the minority stockholder receives at least 'the substantial equivalent in value of what he had before.'"[95]  It next considered numerous factors that could trigger entire fairness and cited several cases where Delaware courts applied entire fairness to transactions not involving "a specific amount of cash per share."[96]  The court stated that "[t]aken to its logical extreme, the defendants' argument would mean that a court could not apply entire fairness in a stock-for-stock merger, because there is no dollars-and-cents price."[97]  Finally, the court concluded that the Conversions in this case operate like stock-for-stock mergers and that the court could conduct an entire fairness inquiry and consider "whether stockholders received the substantial equivalent of what they had before."[98]

---

[93] *Id.*

[94] *Id.*

[95] *Id.* at 278 (quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952)).

[96] *Id.* at 279 (citing *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *11–16 (Del. Ch. Jan. 25, 2016) (collecting authorities)).

[97] *Id.* at 280.

[98] *Id.*

*d. The Court of Chancery Held That Plaintiffs Pled Sufficient Facts to Question Whether Entire Fairness May Apply*

The court held that Plaintiffs had pled sufficient facts to make it reasonably conceivable that the Conversions were not entirely fair and, thus, Defendants have the burden of demonstrating entire fairness. On the fair price prong, the court found that Plaintiffs had pled sufficient facts showing that stockholders will not "receive the substantial equivalent of what they had before."[99] As to the fair dealing prong,[100] the court concluded that the allegations supported an inference that the Conversions were not procedurally fair. As alleged, the controller and the directors did not implement any procedural protections, and the controller delivered the vote as the unaffiliated stockholders resoundingly rejected the Conversions. Finally, the court rejected Defendants' argument that other benefits of the Conversions made the transaction fair. The court considered the reduction in franchise taxes immaterial given the corporations' sizes and improved management recruitment ability not to be a separate benefit because it is merely a function of reduced litigation exposure.[101] Regardless, the court determined that the countervailing benefits could not be addressed at that stage.[102]

---

[99] *Id.* at 281. The court described the fair price prong as the "substantive dimension of fairness." *Id.*

[100] *Id.* The court described the fair dealing prong as the "procedural dimension of fairness." *Id.*

[101] *Id.* at 282.

[102] *Id.*

*e. The Court of Chancery Focused on Stockholders' "Litigation Rights"*

The court described three types of stockholder's rights: economic rights, governance rights, and litigation rights. The court discussed how curtailing economic or governance rights would trigger entire fairness and reasoned that "[t]he same should be true for litigation rights."[103] It noted that access to courts is necessary to protect the other rights and that "[w]ithout legal protection, an investor's capital becomes a gift."[104] The court then held that "[f]rom the perspective of equity, Delaware law should be just as concerned about transactions that reduce stockholders' litigation rights as it is about transactions that reduce their economic rights or governance rights."[105] Finally, the court concluded that "[t]his decision treats litigation rights as first-class rights."[106]

*f. The Court of Chancery Denied Injunctive Relief*

The court rejected Defendants' argument that a Delaware court could never enjoin an entity from leaving the state since the court has the power to prevent persons and assets from leaving its jurisdiction when necessary to preserve its ability to award final relief.[107] However, the court found that such circumstances were not present because money

---

[103] *Id.* at 283.

[104] *Id.* at 284.

[105] *Id.* In a footnote, the court observed that "[t]he role of equity in protecting litigation rights has become more important, because the Delaware Supreme Court recently confirmed that Section 242(b)(2) does not provide protection against modifications to litigation rights." *Id.* at n.96 (citing *In re Fox Corp./Snap Inc.*, 312 A.3d 636 (Del. 2024)). The court also observed that "[m]ergers have long been able to modify all types of stockholder rights, including litigation rights." *Id.* The court concluded that "[a]s a practical matter, only equitable review protects litigation rights." *Id.*

[106] *Id.* at 284.

[107] *Id.* at 284–85.

damages would be an adequate remedy and, therefore, Plaintiffs failed to make the showing necessary for injunctive relief.

### 4. The Court of Chancery Denied Certification of Interlocutory Appeal

Following the Court of Chancery's decision, Defendants asked the court to certify the order for interlocutory review. The court denied the application.[108]

The court rejected Defendants' argument that the opinion decided a substantial issue. The court observed that it "addressed the likely standard of review for pleading-stage purposes[]"[109] but "did not make a final determination regarding the standard of review."[110] And the court noted that if "the defendants could show that Nevada law did not differ materially from Delaware law[]", entire fairness would not apply and the business judgment rule would control.[111]

The court then rejected Defendants' argument that the opinion decided a substantial issue because the opinion "'created the prospect of prolonged, expensive litigation and an uncertain damages award.'"[112] The court found this argument to be flawed because it would support excessive interlocutory review and because Defendants could take actions

---

[108] *Palkon v. Maffei*, 2024 WL 1211688, at *1 (Del. Ch. Mar. 21, 2024) (Memorandum Opinion Denying Application for Interlocutory Appeal).

[109] *Id.* at *3.

[110] *Id.*

[111] *Id.*

[112] *Id.* (quoting App. ¶ 6).

to reduce the length and expense of the litigation. The court also rejected Defendants' arguments that the opinion would preclude alleged controlled companies from leaving.[113]

The Court of Chancery noted that "[b]ecause the Opinion did not decide a substantial issue, this decision could stop there."[114] However, the court discussed additional elements "[o]ut of an abundance of caution"[115] and ultimately concluded that those elements did not support granting the interlocutory appeal.[116]

### 5. *This Court Granted Interlocutory Appeal*

In April 2024, this Court accepted an interlocutory appeal of the Court of Chancery's decision.[117] We concluded that the application met the standards for review under Rule 42(b).[118] We supported this decision stating that:

> Certainty regarding the standard of review applicable to a decision to reincorporate in another jurisdiction would be beneficial, the Interlocutory Opinion involves a question of law regarding reincorporation in another jurisdiction that was decided for the first time in this state, interlocutory

---

[113] *Id.* at *4. The court also rejected Defendants' argument "that the Opinion decided a substantial issue because 'thousands of other Delaware corporations ... need certainty as to the rules that apply to a decision to reincorporate in another jurisdiction.'" *Id.* at *5. The court considered this to be "subtly alluding to the disproportionate media attention that the Opinion received after Elon Musk's high-profile comments about forsaking Delaware[,]" *id.*, and concluded that "Rule 42 does not invite a trial court to consider the level of media attention that a decision has received." *Id.*

[114] *Id.* at *5.

[115] *Id.*

[116] *Id.* at *5–12. The court analyzed three factors: (i) whether the opinion involves a question of first impression, *id.* at *5–7; (ii) whether decisions of the trial courts conflict, *id.* at *7–10; and (iii) whether review would terminate the litigation and serve considerations of justice, *id.* at *10–11. It concluded that none of these factors supported interlocutory appeal. The court also concluded that "there [were] not substantial benefits from an interlocutory appeal that outweigh its costs[,]" *id.* at *12, and recommended against interlocutory appeal.

[117] *Maffei v. Palkon*, No. 125, 2024 (Del. Apr. 16, 2024) (ORDER).

[118] *Id.* ¶ 7.

review may terminate the litigation, and the likely benefits of interlocutory review outweigh the probable costs.[119]

Oral argument was held before this Court on October 30, 2024.

### D. Events Following Oral Argument Before This Court

Following oral argument, on December 19, 2024, Defendants issued a press release announcing a proposed transaction that would "result in the simplification of Tripadvisor's capital structure into a single class of shares with no controlling stockholder, thereby creating more strategic flexibility for Tripadvisor."[120] On December 20, 2024, Plaintiffs sent a letter to this Court "to update the Court regarding a development that has, in [Plaintiffs'] view, mooted the appeal."[121] Plaintiffs followed their letter with a Motion to Dismiss Appeal as Moot on January 3, 2025 citing the proposed transaction referred to in the December 19 press release.[122] Defendants filed an opposition to the motion on January 13, 2025.[123]

---

[119] *Id.*

[120] Press Release, TripAdvisor, Tripadvisor and Liberty TripAdvisor Announce Planned Merger (Dec. 19, 2024). This press release was provided to this Court as Ex. A to Pls.' Letter (Dec. 20, 2024).

[121] Pls.' Letter (Dec. 20, 2024).

[122] Motion to Dismiss Appeal as Moot (Jan. 3, 2025).

[123] Defendants' Opposition to Plaintiffs' Motion to Dismiss as Moot (Jan. 13, 2025).

## II. STANDARD OF REVIEW

The standard of review applicable to a decision to reincorporate in another jurisdiction involves a "question of law."[124] "This Court reviews questions of law *de novo*."[125] This Court's review of a trial court's grant of a motion to dismiss is *de novo*.[126]

## III. CONTENTIONS ON APPEAL

Defendants argue that the Court of Chancery erred in finding the Conversions to be subject to entire fairness. Instead, Defendants contend that the business judgment rule applies because there is no pending or contemplated lawsuit and, therefore, Defendants are not receiving a material, non-ratable benefit. Defendants argue for a materiality requirement contending that "[t]he speculative benefits afforded to fiduciaries from risk mitigation do not constitute material benefits requiring entire fairness review."[127] Additionally, Defendants argue that "*MFW* does not afford a solution even if a fiduciary-favorable change to the liability framework on a litigation-clear day constitutes a material, non-ratable benefit to directors."[128]

Finally, Defendants raise several policy arguments against subjecting the Conversions to entire fairness review. Defendants argue that "[t]he Court of Chancery's decision raises comity concerns because it calls for the court 'to quantify the extent of the

---

[124] *Maffei v. Palkon*, No. 125, 2024 ¶ 7 (Del. Apr. 16, 2024) (ORDER); *see also* Opening Br. at 13.

[125] *Wilmington Tr., Nat'l Ass'n v. Sun Life Assurance Co. of Canada*, 294 A.3d 1062, 1071 (Del. 2023).

[126] *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754, 757 n.7 (Del. 2018).

[127] Opening Br. at 3.

[128] *Id.* at 24.

30

harm, if any, that moving from Delaware to Nevada imposes on the unaffiliated stockholders.'"[129] Nor do Defendants view entire fairness review as practical in these circumstances and they question "how . . . a court [is] supposed to determine whether stockholders' allegedly diminished litigation rights (that might not ever be implicated) are more or less valuable than the company's expectation that it will enjoy value-enhancing benefits over the medium and long term?"[130] Defendants conclude by asking this Court to reverse the judgment below.[131]

The State of Nevada filed an amicus brief generally supporting Defendants' position. Nevada argues that the Conversions do not confer a non-ratable benefit that would trigger entire fairness.[132] Nevada argues that the Court of Chancery's opinion "violates principles of comity by calling for Delaware courts to quantify the supposed 'harm' that a move from Delaware might theoretically inflict."[133] Further, Nevada argues that "if Delaware courts engage in that analysis (and they should not), they should take judicial notice of Nevada law as it is (as permitted by Rule of Evidence 202), rather than rely upon fiery rhetoric from professors and legislators."[134] Here, Nevada vigorously disputes the "race to the bottom" characterization of its law and argues that "[t]he description of Nevada as a 'no liability' regime, while colorful, remains academic

---

[129] *Id.* at 27 (quoting *Palkon*, 311 A.3d at 285).

[130] *Id.* at 28.

[131] *Id.* at 31.

[132] Nevada Amicus Br. at 3.

[133] *Id.* at 4.

[134] *Id.*

31

exaggeration."[135]  Finally, Nevada argues that applying the entire fairness standard would risk creating an "exit tax" regime that would ultimately hurt Delaware.

Plaintiffs contend that the Court of Chancery was correct to apply entire fairness because the Conversions convey a non-ratable benefit,[136] the availability of *MFW* cleansing does not impact the standard of review, and policy reasons support applying entire fairness. Accordingly, Plaintiffs argue that this Court should affirm the opinion below.

Plaintiffs' December 20, 2024 letter pointed to a December 19 press release from Tripadvisor that indicated a "'transaction will result in the simplification of Tripadvisor's capital structure into a single class of shares ***with no controlling stockholder***, thereby creating more strategic flexibility for Tripadvisor.'"[137]  In their Motion to Dismiss Appeal as Moot,[138]  Plaintiffs argued that "[b]ecause Tripadvisor is acquiring Liberty TripAdvisor and will no longer be a controlled corporation, the benefit to Maffei of being able to extract greater private benefits of control after redomestication—and the concomitant harm to minority stockholders—no longer exists."[139]  Plaintiffs noted that they "intend to

---

[135] *Id.* at 7.

[136] Answering Br. at 23.  Plaintiffs argue, for example, that "[i]f a controller causes a corporation to redomesticate to a more favorable jurisdiction for controllers—despite an emphatic rejection by minority stockholders—and thereby shifts economic value to itself at their expense, no principle of comity relieves the controller of its obligation to compensate minority stockholders for that reallocation of value." *Id.* at 8.

[137] Pls.' Letter (Dec. 20, 2024) (quoting Press Release, TripAdvisor, Tripadvisor and Liberty TripAdvisor Announce Planned Merger (Dec. 19, 2024)) (emphasis added by Plaintiffs).

[138] Motion to Dismiss Appeal as Moot (Jan. 3, 2025).

[139] *Id.* at ¶ 6.

voluntarily dismiss their Complaint as moot[]"[140] and that "[i]t follows logically that this appeal should be dismissed as moot."[141] Plaintiffs added in a footnote that they "intend to request that the Court of Chancery maintain jurisdiction over any motion for a mootness fee."[142]

Defendants filed an Opposition to Plaintiffs' Motion to Dismiss Appeal as Moot on January 13, 2025 and presented three reasons as to why the appeal was not moot. *First*, they noted that the transaction "has not yet occurred and remains subject to stockholder approval and other closing conditions."[143] *Second*, they argued that Plaintiffs' claims were not reliant on the existence of a controller since they also included claims against the directors.[144] And *third*, they argued that "'[m]ootness does not mandate dismissal' of an appeal[]"[145] because "mootness does not prevent the Court from deciding an appeal that presents 'a principle of Delaware law that could have significant impact in future cases, and that, therefore, should be subject to appellate review before it becomes operational prospectively.'"[146] Finally, Defendants argued that "if Plaintiffs no longer wish to pursue their claims, the correct procedure would be for them to move for voluntary dismissal with

---

[140] *Id.* at ¶ 7.

[141] *Id.* at ¶ 8.

[142] *Id.* at ¶ 7 n.2.

[143] Defendants' Opposition to Plaintiffs' Motion to Dismiss as Moot ¶ 5 (Jan. 13, 2025).

[144] *Id.* at ¶¶ 6, 7.

[145] *Id.* at ¶ 8 (quoting *Glazer v. Pasternak*, 693 A.2d 319, 320 (Del. 1997)).

[146] *Id.* (quoting *King v. VeriFone Hldgs., Inc.*, 12 A.3d 1140, 1144 n.16 (Del. 2011) (deciding appeal where underlying case moot); *accord Texaco Refining & Mktg. Inc. v. Wilson*, 570 A.2d 1146, 1147 (Del. 1990)).

prejudice" and that "[o]f course, this would not provide the opportunity for a 'mootness fee[.]'"[147]

## IV. ANALYSIS

We begin by holding that this appeal is not moot. The transaction that Plaintiffs allege would moot this appeal is merely proposed and remains subject to conditions, including a stockholder vote. Therefore, the controller that existed when the Complaint was filed still exists as a controller.

In addition, the trial court held that Plaintiffs had adequately pleaded that the director defendants were conflicted based upon their proxy statements and board materials.[148] The court found a pleading-stage inference that the directors were interested in the Conversions.[149] At oral argument before this Court, Plaintiffs adhered to the view

---

[147] *Id.* at ¶ 9.

[148] *See* App. to Opening Br. at A59 (Compl. ¶ 77) (alleging that "each of the Proxies admits that the primary purpose of the Conversions is to insulate the director defendants from future stockholder litigation."). The Complaint also alleges that the directors of both companies "breached their fiduciary duties, by approving the self-interested" Conversions "to insulate Maffei and themselves from future liability and without providing any material consideration" to the public stockholders. *Id.* at A69, A71 (Compl. ¶¶ 104, 113).

[149] *Palkon v. Maffei*, 311 A.3d 255, 276–77 (Del. Ch. 2024). In this regard, the Court of Chancery determined that:

> The defendant directors focused on the ability of the conversions to reduce or eliminate litigation risk. The board materials discussed those issues and called out past cases. And the proxy statements told the stockholders that the directors were recommending the conversions to reduce or eliminate litigation risk.
>
> …
>
> The plaintiffs have alleged particularized facts demonstrating that the defendants were interested in the conversions. Entire fairness therefore applies.

*Id.*

that they had independently stated a claim against the directors.[150] Thus, the issue also remains live as to the directors.

As to the merits, we hold that based upon the record presented to us in this interlocutory appeal, the Court of Chancery erred in finding that the Conversions may provide non-ratable benefits sufficient to trigger entire fairness. Instead, the business judgment rule is the appropriate standard of review.

---

*See also id.* at 261 ("The reduction in the unaffiliated stockholders' litigation rights inures to the benefit of the stockholder controller and the directors. That means the conversion confers a non-ratable benefit on the stockholder controller and the directors, triggering entire fairness.").

[150] At oral argument, the following exchange took place:

> [The Court]: [Counsel], would you agree that if we weren't dealing with a controller here and we had a clear day, would a director's independence be subject to challenge simply because she voted to reincorporate in Nevada?
>
> [Counsel]: I think that the director question is a closer call certainly, Your Honor, than the controller call, I think it depends on the facts that are pled, I think the facts here…
>
> [The Court]: Clear day, no controller.
>
> [Counsel]: You could still have the situation like here where the Defendants admit that they are redomesticating for the purpose of receiving that benefit and that's what the Court of Chancery relied on here. I don't think my friend, respectf…
>
> [The Court]: So, in your view that's enough to deem that director not independent and not disinterested?
>
> [Counsel]: I think the question is whether the director is receiving a unique benefit through the transaction that could skew the director's ability to impartially consider whether the redomestication is in the best interest of the company and so I think you can get there in two ways. One, you could say the benefit to the director is sufficient that that satisfies the standard. I think that's a close call in this situation, a redomestication to Nevada. I think another way to get there, to say, okay, the complaint has adequately pled that these director defendants are self-interested in this transaction is that they have admitted that they are voting in favor of this business decision for the purpose of receiving that benefit. And I think that…

Oral Argument 22:34–24:04.

## A. Standards of Review in Corporate Transactions

There are three standards of review for corporate transactions under Delaware law: business judgment, enhanced scrutiny, and entire fairness. Here, Plaintiffs contend that entire fairness applies while Defendants contend that the business judgment rule applies.

"The [business judgment] rule creates a presumption 'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation.'"[151] "Subject to certain well defined limitations, a board enjoys the protection of the business judgment rule in discharging its responsibilities."[152] The burden is on the party challenging the decision to establish facts rebutting the presumption. "The effect of this presumption when applied by a court is that the court will not substitute its judgment for that of the board, unless it is shown by a preponderance of the evidence that the directors' decision involved a breach of fiduciary duty."[153] But, "[i]f the presumption of the business judgment rule is rebutted . . . the burden shifts to the director defendants to prove to the *trier of fact* that the challenged transaction was 'entirely fair' to the shareholder plaintiff."[154]

We have explained how the presumption reflected in the business judgment rule operates in the context of a motion to dismiss as follows:

---

[151] *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

[152] *Id.*

[153] Edward P. Welch *et al.*, *Folk on the Delaware General Corporation Law* 169 (2020 ed.).

[154] *Emerald P'rs v. Berlin*, 787 A.2d 85, 91 (Del. 2001) (emphasis in original); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

Procedurally, the plaintiffs have the burden to plead facts sufficient to rebut that presumption. On a motion to dismiss, the pled facts must support a reasonable inference that in making the challenged decision, the board of directors breached either its duty of loyalty or its duty of care. If the plaintiff fails to satisfy that burden, "a court will not substitute its judgment for that of the board if the ... decision can be attributed to any rational business purpose."[155]

In contrast to the presumption found in the business judgment rule, under entire fairness review, "'the defendants bear the burden of proving that the transaction with the controlling stockholder was entirely fair to the minority stockholders.'"[156] In *Weinberger v. UOP, Inc.*, we described the entire fairness standard as follows:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.[157]

These requirements make "entire fairness [] the highest standard of review in corporate law."[158] Accordingly, "this Court has noted that '[b]ecause the effect of the proper

---

[155] *Gantler v. Stephens*, 965 A.2d 695, 706 (Del. 2009) (quoting *Unocal v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985)) (internal quotation omitted); *see also* Lewis H. Lazarus & Brett M. McCartney, *Standard of Review in Conflict Transactions on Motions to Dismiss: Lessons Learned in the Past Decade*, 36 Del. J. Corp. L. 967 (2011).

[156] *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 700 (Del. 2023) (quoting *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012)).

[157] *Weinberger*, 457 A.2d at 711 (internal citations omitted), *quoted in Tesla*, 298 A.3d at 700.

[158] *Kahn v. M&F Worldwide Corp. (MFW)*, 88 A.3d 635, 644 (Del. 2014), *quoted in Tesla*, 298 A.3d at 700. *See also In re Trados Inc. S'holder Litig. (Trados II)*, 73 A.3d 17, 44 (Del. Ch. 2013) (explaining that entire fairness is "Delaware's most onerous standard").

invocation of the business judgment rule is so powerful and the standard of entire fairness so exacting, the determination of the appropriate standard of judicial review frequently is determinative of the outcome of [the] litigation.'"[159]

## B. Triggers for Entire Fairness Review

This Court has noted that "[t]he entire fairness standard applies only if the presumption of the business judgment rule is defeated."[160] In the director context, "in order to rebut the business judgment rule presumption, an interest must be subjectively material to the director. In other words, the alleged benefit must be significant enough as to make it improbable that the director could perform his fiduciary duties to the shareholders."[161]

---

[159] *Cinerama, Inc. v. Technicolor, Inc. (Cinerama II)*, 663 A.2d 1156, 1163 n.8 (Del. 1995) (quoting *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989)) (internal quotation omitted). However, the entire fairness standard is not impossible to satisfy. *See, e.g.*, *Tesla,* 298 A.3d at 700 (quoting *Cinerama II*, 663 A.2d at 1179) ("Even under our entire fairness standard, '[a] finding of perfection is not a *sine qua non* in an entire fairness analysis.'"); *In re BGC Pr's, Inc. Derivative Litig.*, 2022 WL 3581641, at *18 (Del. Ch. Aug. 19, 2022), *aff'd* 303 A.3d 337, 2023 WL 5127340 (Del. 2023) (TABLE) (quoting *Brinckerhoff v. Tex. E. Prod. Pipeline Co.*, 986 A.2d 370, 395 (Del. Ch. 2010)) ("But '[p]erfection is an unattainable standard that Delaware law does not require, even in a transaction with a controller.'").

[160] *Unitrin, Inc. v. American General Corp.*, 651 A.2d 1361, 1371 n.7 (Del. 1995) (internal quotation omitted). *See also Cinerama II*, 663 A.2d at 1162 (where "the presumption of the business judgment rule has been rebutted, the board of directors' action is examined under the entire fairness standard.").

[161] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 150 (Del. Ch. 2003). *See also Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *5 (Del. Ch. Nov. 30, 2007) ("A director is considered interested when he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, ..."); *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002) ("The key issue is not simply whether a particular director receives a benefit from a challenged transaction not shared with the other shareholders, or solely whether another person or entity has the ability to take some benefit away from a particular director, but whether the possibility of gaining some benefit or the fear of losing a benefit is likely to be of such importance to that director that it is reasonable for the Court to question whether valid business judgment or selfish considerations animated that director's vote on the challenged transaction.").

"Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."[162]

"Entire fairness is not triggered solely because a company has a controlling stockholder."[163] "[C]ases where the controller stands on both sides of the transaction present a particularly compelling reason to apply entire fairness: both corporate decision-making bodies to which Delaware courts ardently defer—the board of directors and disinterested voting stockholders—are considered compromised by the controller's influence."[164] Accordingly, although controlling stockholders are at times free to act in their own self-interest, "a controlling stockholder is a fiduciary and must be fair to the corporation and its minority stockholders when it stands on both sides of a transaction and receives a non-ratable benefit."[165] "Transactions where the controller is on only one side of the transaction also face entire fairness scrutiny to assuage the risk that a controller who stands to earn 'different consideration or some unique benefit' will flex his control to secure

---

[162] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993), *modified on reargument by* 636 A.2d 956 (Del. 1994).

[163] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014).

[164] *Larkin v. Shah*, 2016 WL 4485447, at *9 (Del. Ch. Aug. 25, 2016) (citing *MFW*, 88 A.3d at 644).

[165] *In re Match Grp., Inc. Derivative Litig.*, 315 A.3d 446, 460 (Del. 2024). This Court has noted that stockholders' rights to vote and control their shares are "limited only by any fiduciary duty owed to other stockholders. It is not objectionable that their motives may be for personal profit, or determined by whim or caprice, so long as they violate no duty owed other shareholders." *Id.* at 460 n.96 (citing *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987)). In *Bershad*, we held that "a stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority." *Berhsad*, 535 A.2d at 845.

that self-interested deal to the detriment of minority stockholders."[166]  As we noted in *Match*, "[e]ntire fairness is the standard of review in transactions between a controlled corporation and a controlling stockholder when the controlling stockholder receives a non-ratable benefit."[167]  Accordingly, "where a controlling stockholder transacts with the controlled corporation and receives a non-ratable benefit, the presumptive standard of review is entire fairness."[168]

Here, Defendants include both a controller – Maffei[169] – and several directors. Therefore, we analyze whether entire fairness review applies to either or both sets of defendants.  Entire fairness may apply if Defendants receive a non-ratable benefit from the Conversions.  We conclude that, based on the pleaded allegations, Defendants will not receive a non-ratable benefit from the Conversions and, accordingly, the entire fairness standard of review does not apply.

## C. *Defining a Non-Ratable Benefit*

We begin by defining what a non-ratable benefit is.   In the director context, "a director is considered interested 'when he or she will receive a personal financial benefit

---

[166] *Larkin*, 2016 WL 4485447, at *9 (quoting *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1033 (Del. Ch. 2012)).  In *Synthes*, the Court of Chancery stated that "[t]he argument in [the one-sided controller transaction] context is that the controller used its power over the company to cause the company to enter into a transaction that was not equal to all the stockholders, and unfair to the minority because the controller unfairly diverted proceeds that should have been shared ratably with all stockholders to itself."  *Synthes*, 50 A.3d at 1033.

[167] *Match*, 315 A.3d at 462.

[168] *Id.* at 460.

[169] Defendants do not dispute that Maffei is a controller for purposes of this appeal.  Opening Br. at 5.  ("For the sake of their motion to dismiss (and this appeal), Defendants do not dispute the allegation that Maffei controls the Companies.").

from a transaction that is not equally shared by the stockholders.'"[170] "'The benefit received by the director and not shared with stockholders must be of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties ... without being influenced by her overriding personal interest.'"[171]

In the controller context, "the plaintiffs must plead that [the controller] had a conflicting interest in the Merger in the sense that he derived a personal financial benefit 'to the exclusion of, and detriment to, the minority stockholders.'"[172] "A non-ratable benefit 'exists when the controller receives a unique benefit by extracting something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders.'"[173]

"Delaware decisions have applied the entire fairness framework to compensation arrangements, consulting agreements, services agreements, and similar transactions

---

[170] *Frederick Hsu Living Tr.*, 2017 WL 1437308, at *30 (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[171] *Id.* (quoting *In re Trados Inc. S'holder Litig. (Trados I)*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009)) (internal citation omitted).

[172] *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1034 (Del. Ch. 2012) (quoting *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del. 1971)). In *Synthes*, the Court of Chancery observed that except in very narrow circumstances "a fiduciary's financial interest in a transaction as a stockholder (such as receiving liquidity value for her shares) does not establish a disabling conflict of interest when the transaction treats all stockholders equally, as does the Merger." *Id.* at 1035.

[173] *City of Dearborn Police and Fire Revised Ret. Sys. v. Brookfield Asset Mgmt.*, 314 A.3d 1108, 1137 n.130 (Del. 2024) (quoting *In re Viacom Inc. S'holders Litig.*, 2020 WL 7711128, at *16 (Del. Ch. Dec. 29, 2020) (internal quotation marks and citation omitted)). In *Brookfield*, regarding the quoted language above, the Court was referring to the proxy's failure to disclose Brookfield's $130 million in projected management fees which Brookfield allegedly stood to derive from the merger. *Id.* at 1137–38.

between a controller or its affiliate and the controlled entity."[174] However, the mere fact that a controller may be better positioned after a transaction does not necessarily mean that the controller received a non-ratable benefit. In *Williams v. Geier*,[175] "we affirmed the Court of Chancery's business judgment review of a recapitalization that involved a charter amendment that provided for a form of tenure voting."[176] In *Williams*, "charter amendments implement[ed] tenure voting[]"[177] and "the controlling stockholders 'reap[ed] a benefit' from the transaction."[178] "But the *Williams* majority also concluded that 'no non-pro rata [sic] or disproportionate benefit. . . accrued to the [controlling stockholders] on the face of the Recapitalization, although the dynamics of how the Plan would work in practice

---

[174] *In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *13, *15 (Del. Ch. Jan. 25, 2016) (citing, *inter alia*, *Levco Alt. Fund Ltd. v. Reader's Digest Ass'n, Inc.*, 803 A.2d 428, 2002 WL 1859064 (Del. Aug. 13, 2002) (TABLE) (entire fairness standard applied to a recapitalization in which a corporation repurchased shares from its controlling stockholder in return for a combination of cash and stock); *Summa v. Trans World Airlines, Inc.*, 540 A.2d 403, 407 (Del. 1988) (entire fairness standard applied when controlled corporation purchased aircraft or leased planes from its controlling stockholder); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 183–85 (Del. Ch. 2014) (entire fairness standard applied to payments made under license agreement between a company and its controlling stockholder); *Carlson v. Hallinan*, 925 A.2d 506, 529–37 (Del. Ch. 2006) (entire fairness standard used to evaluate (i) compensation paid to a corporation's controlling stockholder, who was also a director, (ii) management fees paid to affiliates of the controlling stockholder, and (iii) the failure to allocate expenses properly to affiliates of the controlling stockholder who received services from the corporation.); *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 551 (Del. Ch. 2000) (entire fairness standard applied to multi-million dollar annual fee services agreement between company and another company owned by company's controlling stockholder)). We note that the parties have not brought to this Court's attention any case that holds that a more protective statutory scheme constitutes a non-ratable benefit where no stockholder litigation is pending or threatened. *See* Opening Br. at 20; Answering Br. at 35 n.70.

[175] 671 A.2d 1368 (Del. 1996).

[176] *In re Match Grp., Inc. Derivative Litig.*, 315 A.3d 446, 466 (Del. 2024) (citing *Williams*, 671 A.2d at 1370).

[177] *Id.* (citing *Williams*, 671 A.2d at 1372).

[178] *Id.* (quoting *Williams*, 671 A.2d at 1381–82).

had the effect of strengthening the [controlling stockholders'] control.'"[179]  In *Match*, we distinguished *Williams* observing that in *Williams*, "[e]ntire fairness review did not apply because the controlling stockholders received the same benefit as other stockholders."[180]

### 1. A Non-Ratable Benefit Must Be Material to Trigger Entire Fairness In This Context

The concern over controller and director self-interest animates the entire fairness standard,[181] and the cases suggest that a non-ratable benefit must be material to trigger entire fairness review.  As the Court of Chancery noted, "[a] fiduciary is interested in a transaction when it confers a material benefit on the fiduciary."[182]

We agree with the Vice Chancellor that a materiality requirement is appropriate in the context of this case where the principal focus has been on the alleged non-ratable benefits potentially flowing to the controller.  Further, such a requirement achieves continuity with our law in the director context where we have more explicitly stated that non-ratable benefits and financial interests must be sufficiently material in order to taint director interest.[183]

---

[179] *Id.* at 466–67 (quoting *Williams*, 671 A.2d at 1378).

[180] *Id.* at 467.

[181] *In re LNR Property Corp. S'holders Litig.*, 896 A.2d 169, 175 (Del. Ch. 2005) (citing *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)) ("A well settled precept of Delaware corporate law is that a fiduciary is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.  This is founded on the belief that a fiduciary cannot be expected to exercise his or her independent business judgment without being influenced by the personal benefits resulting from the transaction.").

[182] *Palkon*, 311 A.3d at 273.

[183] For example, we highlight the focus on materiality in prongs one and three of the demand futility test set forth in *United Food and Comm. Workers Union and Participating Food Indus.*

## 2. *Temporality of Litigation Is a Key Factor in Determining Materiality*

The Court of Chancery rejected the idea that Delaware precedent has a temporal distinction that distinguishes between cases based on existing versus future potential liability. The court read precedent as supporting a materiality requirement as opposed to a temporal distinction. We do not view these concepts as mutually exclusive. Rather, our reading of Delaware precedent persuades us that temporality is a key factor because it weighs heavily in determining materiality in this context.

We recognize that providing protection to directors against future liability exposure does not automatically convey a non-ratable benefit. Were this the case, no board could use company funds to procure a Side A policy or adopt a Section 102(b)(7) exculpation provision without triggering entire fairness review. Yet Delaware courts have declined to find that directors lack independence or disinterestedness because they adopted a Section 102(b)(7) provision, even though such provisions reduce a director's future liability exposure.[184] Our courts have also held that the receipt of indemnification benefits does not necessarily taint a director's judgment with self-interest.[185] Finally, boards almost

---

*Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) ("(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;" and "(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.").

[184] *Orloff v. Shulman*, 2005 WL 3272355, at *13 (Del. Ch. Nov. 23, 2005).

[185] *See, e.g., Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007) ("There is no basis for inferring the receipt of indemnification benefits is material, or likely to taint the individual defendants' judgment."); *Chester Cty. Emps' Ret. Fund v. New Residential Inv. Corp.*, 2017 WL 4461131, at *7 (Del. Ch. Oct. 6, 2017) (quoting *In re Sea–Land Corp. S'holders Litig.*, 642 A.2d 792, 804 (Del. Ch. 1993), *aff'd sub nom. Sea–Land Corp. S'holder*

universally procure D&O policies, which reduce the risk of director liability exposure in future litigation.[186]

Based upon our review of the precedent, as further explained below, we conclude that temporality weighs heavily in determining materiality here and, ultimately, whether a non-ratable benefit exists that triggers entire fairness review. We hold that the absence of any allegations that any particular litigation claims will be impaired or that any particular transaction will be consummated post-conversion, weighs heavily against finding that the alleged reduction in liability exposure under Nevada's corporate law regime is material.[187]

---

*Litig. v. Abely*, 633 A.2d 371, 1993 WL 385067 (Del. Sept. 21, 1993) (TABLE)) ("[T]his Court has held that 'the receipt of indemnification is not [normally] deemed to taint related director actions with a presumption of self-interest. That is because indemnification has become commonplace in corporate affairs, and because indemnification does not increase a director's wealth.'").

[186] Lawrence J. Trautman & Kara Altenbaumer-Price, *D & O Insurance: A Primer*, 1 Am. U. Bus. L. Rev. 337, 339 (2011) ("D&O policies are purchased by essentially all public corporations, and settlements of shareholder litigation are greatly impacted by limitations within these policies."). Further, this Court held in *RSUI Indemnity Co. v. Murdock* that public policy is not offended by enforcing a D&O policy that provides coverage for breaches of the duty of loyalty. 248 A.3d 887, 902–03 (Del. 2021).

[187] This Court has referred to litigation "clear days" and also used the "clear day" distinction to uphold advanced notice bylaws adopted prior to an imminent proxy contest. *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund Ltd.*, 224 A.3d 964, 980 (Del. 2020). However, this Court has noted that when a board "faced a serious consent solicitation" it was not a "clear day" and for the board "the skies were cloudy, and it was raining." *Coster v. UIP Cos., Inc.*, 300 A.3d 656, 664 (Del. 2023) (discussing *Blasius Indus., v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988)). *See also AB Value P'rs, LP v. Kreisler Mfg. Corp.*, 2014 WL 7150465, at *3 (Del. Ch. Dec. 16, 2014) (upholding advance notice bylaw noting, among other things, that it was adopted on a "clear day"); *Goggin v. Vermillion, Inc.*, 2011 WL 2347704, at *4 (Del. Ch. June 3, 2011) (same); William D. Johnson, *Flexibility Under Delaware Law in Drafting Advancement Provisions on a "Clear Day," and Potential Surprises for Those Who Do Not Take Advantage of That Flexibility*, 13 Del. L. Rev. 21, 29 (2011) (emphasizing the importance of a "clear day" in drafting advancement provisions and concluding that "[b]usiness entities and their managers have an opportunity under Delaware law to exercise drafting flexibility in connection with advancement and indemnification so long as they do so before a dispute arises. Failure to avail themselves of this opportunity can result in costly remorse.").

Several cases illustrate the importance of temporality. To begin with, advancement cases show that entire fairness review does not apply to director decisions to adopt provisions regarding the advancement of litigation expenses when those provisions are adopted without regard to any particular litigation or expenses.

In *Orloff v. Shulman*, the Court of Chancery rejected "the plaintiffs' claim that the defendants violated their fiduciary duties by approving a bylaw amendment which provided for the advancement of legal fees during litigation."[188] The court observed that "[t]he law of Delaware is clear on the permissibility of advancing legal fees[]" and that is "especially true" when "the plaintiffs challenge the adoption of a bylaw that requires the corporation to advance litigation costs sometime in the future rather than challenging the directors' decision to advance particular litigation expenses."[189]

In *Underbrink v. Warrior Energy Services Corp.*,[190] the board of the defendant corporation on which the plaintiffs were serving had adopted a mandatory advancement bylaw by unanimous written consent.[191] After leaving the board, the plaintiffs sought advancement when they were subsequently named in a Texas action.[192] The defendant corporation refused advancement, and the plaintiffs filed suit.[193] Although the defendant corporation alleged that the plaintiffs "knew that they were being targeted as directors of

---

[188] *Orloff*, 2005 WL 3272355, at *13.

[189] *Id.*

[190] 2008 WL 2262316 (Del. Ch. May 30, 2008).

[191] *Id.* at *4.

[192] *Id.* at *5.

[193] *Id.* at *6.

[the defendant corporation,]" the court observed that none of the proposed factual findings showed that the plaintiffs faced anything more than "an 'imminent threat of litigation' for actions taken by them as [the defendant corporation's] directors (*e.g.,* they were not named defendants in the Texas Proceeding) such that the Board, when it enacted the 2006 Bylaws, was in fact advancing litigation expenses for a particular proceeding."[194]  In declining to apply entire fairness, the court drew an analogy to *Orloff* and found the defendant was "'challeng[ing] the adoption of a bylaw that requires the corporation to advance litigation costs sometime in the future rather than challenging the directors' decision to advance particular litigation expenses.'"[195]  After finding that the bylaw was reasonable, the court applied business judgment review and concluded that the bylaw was properly adopted and valid.[196]

Case law also demonstrates that courts draw a distinction between limitations of directors' liability exposure for past acts and future acts.  This distinction can be seen by comparing cases where directors adopted provisions under Section 102(b)(7) – which, by their terms, cannot limit directors' liability for past conduct[197] – with cases where directors acted to extinguish existing potential liability for past conduct.

---

[194] *Id.* at *12.

[195] *Id.* at *13 (quoting *Orloff*, 2005 WL 5750635, at *13).  In other words, the directors were not the targets of any particular litigation but were "subject to an imminent threat of litigation."  *Id.* at *12.

[196] *Id.*

[197] 8 *Del. C.* § 102(b)(7) ("No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective.").

In *Orloff*, the director defendants approved an amendment to the corporation's certificate of incorporation, "which include[d] a Section 102(b)(7) provision protecting the directors from personal liability for violations of due care."[198] The *Orloff* plaintiffs alleged that these by-law changes "were made in conjunction with the plaintiffs' books and records claim under 8 *Del. C.* § 220."[199] And the *Orloff* plaintiffs argued that the director defendants violated their fiduciary duties by adopting this provision "because the directors knew they were in imminent danger of being sued and thus stood on both sides of the 'transaction.'"[200]

The *Orloff* court rejected the plaintiffs' arguments considering them "but variations on the 'directors suing themselves' and 'participating in the wrongs' refrain."[201] The court noted that it had "at least twice before rejected claims of this kind," and cited *Decker v. Clausen*[202] and *Caruana v. Saligman*.[203] In those cases, the court held that the allegations

---

[198] *Orloff*, 2005 WL 3272355, at *13.

[199] *Id.* at *6. The Court of Chancery observed that "[i]n January 2004 [two months before the board adopted the Section 102(b)(7) provision], [plaintiff] George Orloff filed an action in this court pursuant to 8 *Del. C.* § 220(c) to obtain the information necessary to obtain a meaningful bid for the Orloff shares from third parties. Ultimately, Orloff was granted access to a portion of the documents he sought." *Id.* at *2 (internal quotation omitted).

[200] *Id.* at *13.

[201] *Id.*

[202] 1989 WL 133617 (Del. Ch. Nov. 6, 1989). The *Decker* court wrote that "[plaintiff's] allegation that BAC's liability insurance would not cover an action brought by the company against its own directors and the allegation that the directors recommended a charter amendment limiting their liability are but variations on the 'directors suing themselves' and 'participating in the wrongs' refrain." *Id.* at *2. The court added that the allegations "provide no particularized facts creating a reasonable doubt that the directors are disinterested or independent." *Id.*

[203] 1990 WL 212304 (Del. Ch. Dec. 21, 1990). The *Caruana* court observed that "[p]laintiffs' argument that the directors are interested both because their liability insurance has a typical exclusion from coverage of claims brought by Interco against its directors and because the directors

failed to create a reasonable doubt as to the directors' disinterest, independence, or proper exercise of business judgment. The *Orloff* court concluded that in the absence of "particularized facts creating a reasonable doubt that the directors were disinterested or independent when they made their decision to approve the certificate amendment[,] […] the directors' decision to adopt a Section 102(b)(7) provision, which was later approved by the shareholders, does not provide any reason to depart from the court's settled precedent."[204]

Similarly, the Court of Chancery applied this settled precedent in *Sutherland v. Sutherland*[205] where the defendants added a Section 102(b)(7) provision as a charter amendment. The *Sutherland* plaintiff had already filed a Section 220 action and argued that the defendants used the Section 102(b)(7) provision "to insulate themselves from liability[.]"[206]

The court rejected the plaintiffs' claim holding that "[e]ven if the Defendants, however, recognized the potential personal benefit of adopting these charter amendments, making the amendments was not wrongful."[207] To support its decision, the court cited *Caruana v. Saligman*, and *Decker v. Clausen*, noting that "[t]he [c]ourt, in each instance, concluded that such allegations failed to create a reasonable doubt that the directors were

---

recommended and approved a charter amendment limiting their liability has been made before[,]" and the court cited *Decker v. Clausen* in rejecting the argument. *Id.* at *4.

[204] *Orloff*, 2005 WL 3272355, at *13.

[205] 2010 WL 1838968, at *14 (Del. Ch. May 3, 2010).

[206] *Id.*

[207] *Id.*

disinterested or not independent."[208] The court also cited *Orloff* considering it to be a case addressing the precise issue raised in *Sutherland*.[209] In discussing *Orloff*, the *Sutherland* court noted that it would adhere to *Orloff*'s path of following the *Caruana* and *Decker* line of cases.[210] Accordingly, the court dismissed the plaintiff's claims regarding the adoption of the Section 102(b)(7) provision.

But Delaware courts have applied entire fairness review when directors or controllers have adopted exculpatory provisions to shield themselves from claims based on *past* conduct. The Court of Chancery refused to apply the business judgment rule in *Bamford v. Penfold, L.P.* where the controller adopted an exculpatory provision while "fac[ing] claims for breach of the duty of loyalty based on his past conduct[.]"[211] The *Bamford* court noted that the controller "sought to cut off that threat [of litigation]"[212] and that a provision eliminating liability "prospectively and retrospectively" gave the controller a material benefit.[213] Accordingly, the decision to approve the exculpatory provision was subject to entire fairness review.[214]

The *Bamford* court noted that "[f]iduciaries who control an entity can adopt prospective protective provisions, including exculpatory provisions, particularly if the

---

[208] *Id.*

[209] *Id.* at *15.

[210] *Id.*

[211] *Bamford v. Penfold, L.P.*, 2022 WL 2278867, at *35 (Del. Ch. June 24, 2002).

[212] *Id.*

[213] *Id.* at *34–35.

[214] *Id.* at *35.

provisions do not implicate the duty of loyalty."[215] The court distinguished *Orloff*, in part, by noting that a Section 102(b)(7) provision – as was adopted by the *Orloff* directors – does not eliminate liability retrospectively.[216] In contrast, Manheim – one of the *Bamford* defendants – "sought to eliminate any liability for breaches of the duty of loyalty. He attempted to adopt a provision that not only limited liability prospectively, but also retrospectively."[217] In concluding that defendant Manheim received a benefit, the court held that:

> Manheim faced claims for breach of the duty of loyalty based on his past conduct. Manheim sought to cut off that threat and benefit himself through the adoption of the Exculpatory Provision. Superficially, the Exculpatory Provision treated all Covered Persons equally. But because Manheim had engaged in misconduct and faced litigation risk, it was really Manheim who benefitted.[218]

Similarly, in *Harris v. Harris*,[219] the Court of Chancery found a unique benefit when the defendants pursued a reincorporation designed to defeat stockholder standing to pursue

---

[215] *Id.* at *34.

[216] *Id.* (citing 8 *Del. C.* § 102(b)(7) ("No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective.")). The court also sought to distinguish *Orloff* because public policy allowed for duty of care exculpation under Section 102(b)(7), but public policy did not allow for duty of loyalty exculpation as in *Bamford*. *Id.* We note that the Nevada statute does not provide complete exculpation from duty of loyalty breaches. Rather, the Nevada statute does not permit exculpation for "intentional misconduct, fraud, or knowing violation of the law." N.R.S. 78.138(7). *See also* Nevada Amicus Br. at 9 ("In other words, while Nevada's statute does not separate breaches of the duty of care from the duty of loyalty, it does not permit exculpation for acts of 'intentional misconduct' in either case. Of course, most violations of the duty of loyalty, such as self-dealing, are intentional.").

[217] *Bamford*, 2022 WL 2278867, at *34.

[218] *Id.* at *35.

[219] 2023 WL 115541 (Del. Ch. Jan. 6, 2023).

a stockholder derivative action.[220] The *Harris* court noted both the prospect of litigation, and that the defendant "[a]dvisors also thought that the Outbound Merger would cut off the [plaintiffs'] standing to assert derivative claims regarding events predating the merger[.]"[221] Further, the court observed that, in the context of the alleged past conduct, "the extinguishment of derivative standing can confer a unique benefit on the fiduciaries that approved the merger, thereby subjecting the merger to a direct challenge."[222]

The cloud of litigation relating to past conduct also led the Court of Chancery to apply entire fairness in *In re Riverstone National, Inc. Stockholder Litigation*.[223] There, defendants acted to extinguish their existing potential liability after the plaintiffs notified the defendants of claims that the defendants "breached their fiduciary duties by usurping the opportunity to invest in Invitation Homes[]"[224] and plaintiffs filed a books and records suit. The court noted that "[s]hortly after the Merger Board was notified of the [p]laintiffs' investigation, the Merger Board executed the Merger Agreement, dated May 30, 2014, that purportedly released all potential liability concerning the Usurpation Claims that may have followed from that investigation."[225] The court found that these facts, combined with the rest of the plaintiffs' pleading, demonstrated "that the majority of the Merger Board was

---

[220] *Id.* at \*2. The Court of Chancery, in discussing *Harris*, stated that the merger there "extinguished the plaintiffs' standing to pursue those [derivative] claims," and that "the defendants received a non-ratable benefit from the reincorporation merger." *Palkon*, 311 A.3d at 270–71.

[221] *Harris*, 2023 WL 115541, at \*6.

[222] *Id.* at \*10.

[223] 2016 WL 4045411 (Del. Ch. July 28, 2016).

[224] *Id.* at \*14.

[225] *Id.*

52

interested in the Merger."[226]   In reaching this conclusion, the court emphasized the importance of an existing claim to finding a material, non-ratable benefit explaining as follows:

> For the reasons above, the Plaintiffs have pled with particularity that, at least, Pearson and the Goulds were aware that they faced a derivative claim at the time they were considering the Merger, that the claim was viable, and that potential liability was material to them.  They approved a merger which precluded prosecution of those claims derivatively, as a matter of law, and precluded the acquirer's pursuit of the claims as a matter of contract.  They thus secured a valuable benefit from the Merger not shared by the stockholders.  In light of this self-interest, their duty of loyalty is implicated, and the presumption of the exercise of business judgment overcome.[227]

After this, the court concluded that the plaintiffs had "adequately pled facts indicating that entire fairness applies *and* that the transaction was not entirely fair, sufficient to withstand the Defendants' Motions to Dismiss."[228]

In the opinion below in this case, the Court of Chancery cited several cases to support the principle that "[u]nder Delaware law, a controller or other fiduciary obtains a non-ratable benefit when a transaction materially reduces or eliminates the fiduciary's risk

---

[226] *Id.* at *15.  The court described the plaintiffs' pleading as follows:

> Plaintiffs plead particularized facts with respect to individual directors showing the existence of a chose-in-action against the directors which, if brought as a claim would have survived a motion to dismiss; that the director at the time of negotiating and recommending the merger was aware of the potential action; that the potential for liability was material to the director; and that the directors obtained and recommended an agreement that extinguished the claim directly by contract. Where, as here, such a pleading is made with respect to a majority of the directors, the complaint is sufficient to rebut the business judgment rule.

*Id.* at *8.

[227] *Id.* at *15.

[228] *Id.* (emphasis in original).

of liability."[229]  However, we note that these cases all involved existing potential liabilities from past conduct that the litigated transactions may have extinguished.  Therefore, we read these cases as supporting the principle that limiting liability for existing potential liabilities stemming from past conduct may convey a non-ratable benefit on fiduciaries.

Taken together, these cases suggest that the hypothetical and contingent impact of Nevada law on unspecified corporate actions that may or may not occur in the future is too speculative to constitute a material, non-ratable benefit triggering entire fairness review. Given that Plaintiffs have not alleged any past conduct that would lead to litigation, this case aligns with our case law that applies the business judgment rule.  As noted below, this

---

[229] *Palkon*, 311 A.2d at 270 n.26 (citing *In re AmTrust Fin. Servs., Inc. S'holder Litig.*, 2020 WL 914563, at *11–12 (Del. Ch. Feb. 26, 2020) (defendants did not challenge that "(i) that [the defendants] were aware that they faced a derivative claim in the Cambridge Action when they were considering whether to approve the Transaction, (ii) that the claim was viable, or (iii) that the potential liability they faced was material to each of them personally."); *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at *13 (Del. Ch. June 25, 2018), *aff'd sub nom. IDT Corp. v. JDS1, LLC*, 206 A.3d 260, 2019 WL 913376 (Del. Feb. 22, 2019) (*Straight Path I*) (TABLE) ("[Individual defendant] insisted that the indemnification claim be settled for a relatively small amount of consideration.  [Individual defendant] extracted significant, non-ratable benefits from this settlement:  forgiveness of [defendant-corporation]'s enormous debt, and the assurance that [defendant corporation] would not face bankruptcy as a result of its obligations to Straight Path."); *In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at *1 (Del. Ch. July 28, 2016) (complaint pled, plausibly, "that a chose-in-action against a majority of directors existed, pre-merger, for usurpation of corporate opportunity; that a claim brought on that ground derivatively would have withstood a motion to dismiss; that such an action by stockholders was threatened, and that threat was known to the board, at the time the company contemplated and negotiated the merger; that the implied liability was material to the directors so threatened; and that the merger agreement the directors obtained and recommended both eliminated the threatened derivative suit by operation of law, *and* eliminated *any* pursuit of the matter as a corporate asset purchased by the acquirer, as a matter of contract."); *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 487 (Del. Ch. 2013) (observing that "it is reasonably conceivable that the Merger conferred a unique benefit on KKR[]" that was not shared with other stockholders, and that "[w]hen KKR and the Merger Board elected to sell Primedia, they knew that the plaintiffs in the Derivative Action had pursued the claims tenaciously, including by obtaining the Dismissal Ruling, thoroughly litigating the SLC's dismissal motion, and then taking an appeal.  There was no chance that the plaintiffs would simply abandon the field.")).

temporality distinction aligns with other areas of our case law where our courts have limited plaintiffs' abilities to pursue litigation based upon scenarios where liability is speculative or hypothetical. Given the absence of any allegations that the Conversion decisions were made to avoid any existing or threatened litigation or that they were made in contemplation of any particular transaction, we hold that Plaintiffs have failed to adequately allege facts showing Defendants' receipt of a material, non-ratable benefit.

### 3. Courts Apply Temporal Distinctions Regarding Speculative Liability in Other Areas and Courts Can Do So When Reviewing Corporate Transactions

We respectfully disagree with the Court of Chancery that such a temporal distinction is "arbitrary"[230] and "hard to follow."[231] Courts routinely apply temporal distinctions to require litigants to do more than speculate. Defendants correctly argue that courts readily draw these distinctions in other circumstances, and they cite requirements for standing under the United States and Delaware Constitutions, as well as the federal and Delaware Declaratory Judgment Acts as examples. We agree with Defendants' position.

For example, our ripeness jurisprudence shows that Delaware courts regularly require more than speculation about future litigation for a party to litigate a claim. In *Rollins International v. International Hydronics Corp.*, we addressed a case where the defendant asserted a counterclaim seeking "a declaratory judgment to declare that it ha[d] no present duty to [the plaintiff] under the non-disclosure paragraphs of the agreements, that the paragraphs are void and unenforceable, and that [the defendant] acquired no

---

[230] *Palkon*, 311 A.3d at 271.

[231] *Id.* at 273.

specialized knowledge, technical know-how or trade secrets within the meaning of these paragraphs."[232]  In addressing the plaintiff's contention that no actual controversy existed, we held that "[w]hile it is true that courts will not entertain suits seeking an advisory opinion or an adjudication of hypothetical questions, the courts do entertain declaratory judgment actions where the alleged facts are such that a true dispute exists and eventual litigation appears to be unavoidable."[233]

In allowing the case to proceed, we noted that "[t]he basic dispute clearly went and continues to go beyond the particular claim of breach . . . and included and appears to continue to include charges of breach by disclosure to others yet unknown to plaintiffs as to which an injunction was sought and as to which injunctions are very likely to be sought in the future."[234]  At the same time, we noted "that the holding of this Court does not make declaratory relief instantly available to any party to a contract upon a mere allegation that a term of the contract may be subject to some future significant difference of opinion."[235] Rather, our Court held that "a sufficient state of facts has been alleged in the present

---

[232] *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662 (Del. 1973).  We noted that "[a]s the basis of the appeal it is argued that no 'actual controversy' is alleged in the counterclaim to form the basis for jurisdiction in a declaratory judgment action.  The sole issue before this Court is whether [the defendant] has stated an 'actual controversy' within the meaning of the Declaratory Judgment Act, 10 *Del. C.* [§] 6501."  *Id.*

[233] *Id.*; *see also Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 959 (Del. Ch. 2013) ("Under our law, our courts do not render advisory opinions about hypothetical situations that may not occur.").

[234] *Rollins*, 303 A.2d at 663.

[235] *Id.*

56

instance so as to prevent the questions raised by [the defendant's] counterclaim from being classified as hypothetical."[236]

We applied our ripeness principle again in *Stroud v. Milliken Enterprises, Inc.* where we cautioned against deciding cases when the parties' dispute is not close to a "'concrete and final form.'"[237] In *Stroud*, the plaintiffs alleged that the defendants had provided an inadequate notice regarding the annual stockholders' meeting and proxy materials.[238] In response, the defendants presented a proposed revised notice to the trial court and "plaintiffs charged the defendant directors with failing to provide [the defendant]'s stockholders with 'all information material' to the business of the meeting and with proposing to issue a notice that was false and misleading and in breach of the directors' duty of complete candor."[239]

The parties conceded the original action was moot "but rather than seeking a dismissal of the suit, both parties [sought] a final judicial determination of the legal sufficiency of management's statutory notice technique before putting such process into effect."[240] This Court concluded that the appeal must be dismissed noting that "[t]he parties have thereby inappropriately drawn the trial court into the granting of an advisory opinion

---

[236] *Id.*

[237] *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 481 (Del. 1989) (quoting *Schick v. Amalgamated Clothing and Textile Workers Union*, 533 A.2d, 1235, 1239 (Del. Ch. 1987)).

[238] *Id.* at 477.

[239] *Id.* at 478.

[240] *Id.* at 481.

upon a significant question of corporation law which, in our view, was clearly not ripe for judicial intervention."[241]

We also observed that "before a court should declare the rights of parties in a dispute, it must not only 'be convinced that litigation sooner or later appears to be unavoidable,' but also that the material facts are static and that the rights of the parties are presently defined rather than future or contingent."[242] Given the state of the record, we were "not persuaded that the present record [was] a final record for determining at this time the significant issues raised by the parties."[243]

This Court's standing jurisprudence further shows our reluctance to decide cases involving speculative litigation. In *Employers Insurance Co. of Wausau v. First State Orthopaedics, P.A.*, "[t]he appellee's complaint sought a declaration that a billing code utilized by the appellant to deny insurance coverage to the appellee's patients violated Delaware's workers' compensation law. The appellant, however, implemented a new billing system six months before the appellee filed this action, and none of the codes that the appellant use[d] in its new system contains the challenged language in the old code."[244] In holding that standing did not exist, this Court noted that "[w]e generally follow Article

---

[241] *Id.* This Court also observed that "[a]s *Rollins* establishes, the existence of a controversy is not determinative. Unless a controversy is 'ripe for judicial determination,' a court may simply be asked to render an advisory opinion. The law is well settled that our courts will not lend themselves 'to decide cases which have become moot, or to render advisory opinions.'" *Id.* at 480 (quoting *State v. Mancari*, 223 A.2d 81, 82–83 (Del. 1966)).

[242] *Id.* at 481 (quoting *Stabler v. Ramsey*, 88 A.2d 546, 555 (Del. 1952)).

[243] *Id.*

[244] *Emp'rs Ins. Co. of Wausau v. First State Orthopaedics, P.A.*, 312 A.3d 597, 600 (Del. 2024).

III's standing requirements."[245] There, we rejected standing based on speculation noting that standing requires "[a]n actual or imminent injury" that is "neither hypothetical nor conjectural."[246] And we further held that speculation was not sufficient for the redressability requirement because "the plaintiff must show that it is likely, not just speculative, that the requested relief will redress the injury."[247] These cases demonstrate that courts have not hesitated to apply a temporal distinction to decide whether a party has an actionable claim. Thus, we find that a temporal distinction is consistent with how courts evaluate litigation rights and that it is neither "arbitrary," nor "hard to follow."

Here, Plaintiffs' allegations have not satisfied the requirement of pleading a material benefit because they have not alleged anything more than speculation about what potential liabilities Defendants may face in the future.[248] On this record, we cannot conclude that the Conversions would provide Defendants with a material, non-ratable benefit triggering

---

[245] *Id.* at 608. We summarized the three prongs required for standing under Article III as follows:

> First, the plaintiff must allege an injury in fact, which is both concrete and actual or imminent. An actual or imminent injury is one that is neither hypothetical nor conjectural. Second, the plaintiff must show that the injury is caused by the defendant's actions. A plaintiff can meet this prong by demonstrating that the injury is fairly traceable to the defendant's complained-of conduct. And third, the plaintiff must show that their requested relief is likely to redress the injury.

*Id.* (internal citations and quotations omitted).

[246] *Id.*

[247] *Id.* at 613.

[248] *See Chevron*, 73 A.3d at 940 (quoting 3 Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Officers* 3498 (6th ed. 2009)) ("Delaware courts 'typically decline to decide issues that may not have to be decided or that create hypothetical harm.'").

entire fairness review.[249]   Accordingly, we hold that the business judgment rule is the applicable standard of review in this case.

### D. Comity Considerations Reinforce Our Conclusion

We note finally that, although comity concerns are not an independent ground for reversal in this case, our holding furthers the goals of comity by our declining to engage in a cost-benefit analysis of the Delaware and Nevada corporate governance regimes.[250] "'The United States is a federal republic that depends on comity among the states for the peaceful and efficient conduct ... of private commerce.'"[251]   States have taken different approaches on matters such as the scope of director and officer exculpation, standards of review, and the scope of stockholder inspection rights.  And litigation rights, as the Vice

---

[249] We note that Plaintiffs have not alleged that Defendants have taken any articulable, material steps in connection with any post-conversion transactions.  If directors or controllers were to take such steps in furtherance of breaching their fiduciary duties prior to redomesticating, even though such transactions or conduct would not be consummated or take place until after the change of corporate domicile, then our standard of review could be different.  Although we do not reach that issue today, under such a scenario the conduct of those alleged to have engaged in it could still be subject to Delaware law.  *See, e.g.*, *Harris v. Harris*, 2023 WL 115541, at *11 (Del. Ch. Jan. 6, 2023) ("As to matters that occurred while the Company was a Delaware corporation, Delaware law continues to govern.").  But, as we have stated above, the record here suggests the existence of a "clear day" and the absence of any material, non-ratable benefits flowing to the controller or directors as a result of the Conversions.

[250] *See* Nevada Amicus Br. at 13 (stating that "Delaware, as much as Nevada, relies upon its sister states to respect its own policy choices."); *see also Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1052 (Del. 2015) ("Each sovereign is entitled to conduct its own cost-benefit analysis to determine the appropriate balance between compensating victims and fostering commercial activity within its borders."); *see also First Heath Settlement Class v. Chartis Specialty Ins. Co.*, 111 A.3d 993, 998 (Del. 2015) (quoting *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1218 (Del. 1991)) ("'Comity permits one state to give effect to the laws of a sister state, not out of obligation, but out of respect and deference.'").

[251] *Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939, 956 (Del. Ch. 2020) (quoting *Third Ave. Tr. v. MBIA Ins. Corp.*, 2009 WL 3465985, at *1 (Del. Ch. Oct. 28, 2009)).

Chancellor recognized, are only one stick in the corporate governance bundle.[252] Delaware courts are well-aware that "it is more than the statutory words on paper that give life to a system of entity law. Much often depends on the extent to which specific disputes are consistently handled by courts, thus giving business[persons] predictable guidance by which to order their relations."[253]

The record shows that Defendants considered a number of factors in their weighing of the costs and benefits of the Conversions.[254] These factors included the respective court systems,[255] the predictability of the courts with respect to corporate matters,[256] the judges'

---

[252] The Vice Chancellor observed that:

> The floor for substantive fairness is whether stockholders receive at least the substantial equivalent in value of what they had before. Before the conversion, the stockholders held shares carrying the bundle of rights afforded by Delaware law, including a set of litigation rights. After the conversion, the stockholders owned shares carrying a different bundle of rights afforded by Nevada law, including a lesser set of litigation rights.

*Palkon*, 311 A.3d at 262; *id.* at 265 ("The directors also considered other potential factors associated with the conversion.").

[253] *Diedenhofen-Lennartz v. Diedenhofen*, 931 A.2d 439, 442 (Del. Ch. 2007).

[254] *See e.g.*, App. to Opening Br. at A144 (Feb. 2023 Presentation).

[255] *Id.*

[256] *Id.*

expertise in handling such disputes,[257] the development and body of judicial decisions,[258] and the familiarity of market participants with the corporate governance regime.[259]

If one were to determine "whether stockholders received the substantial equivalent of what they had before[]",[260] it would make sense that the companies would consider the value of what the stockholders had regarding the overall integrated corporate governance structure. In addition to the court system,[261] the judges, the state of the development of the case law, and the familiarity of market participants with the regime, such an analysis could also include the process by which corporate statutory amendments are proposed and adopted by the state legislatures,[262] the effectiveness of the state's Secretary of State office

---

[257] *See id.* ("the Delaware courts have a limited number of judges that hear corporate cases who are all well experienced in corporate law matters.").

[258] *See id.* at A167 (March 23, 2023 Presentation) ("Nevada statute-focused law may be less developed and less predictable than the law in Delaware that has been developed by extensive judicial decisions by experienced judges and provides a well-established legal framework.").

[259] *See id.* at A144 (Feb. 2023 Presentation) ("[M]arket participants are familiar with the Delaware corporate law regime and may perceive Nevada laws as less developed or predictable.").

[260] *Palkon*, 311 A.3d at 280.

[261] For example, the Delaware judicial system contains a specialized trial court for corporate matters – the Court of Chancery – which routinely hears appeals on corporate governance disputes. The Court of Chancery was established by the Delaware Constitution of 1792. William T. Quillen and Michael Hanrahan, *A Short History of the Court of Chancery*, Delaware Court of Chancery, https://courts.delaware.gov/chancery/history.aspx. The Court of Chancery is without jurisdiction to hold jury trials or award punitive damages. *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 886 (Del. Ch. 2002) ("Absent a statutory grant of authorization, the Delaware Court of Chancery does not have jurisdiction to assess punitive damages."); *see also Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1, 11 (Del. Ch. 2019) ("[F]actual determinations for which a defendant could traditionally insist on a jury at law are, in Chancery, reserved to the Court."). Unlike Delaware, other states have chosen to make jury trials and punitive damages available in the resolution of corporate disputes.

[262] In Delaware, for example, "the function of identifying and crafting legislative initiatives in the field of corporate law has been performed by the Corporation Law Section of the Delaware State Bar Association." Lawrence A. Hamermesh, *The Policy Foundations of Delaware Corporate Law*, 106 Colum. L. Rev. 1749, 1755 (2006). "In particular, it is the governing body of the Corporation

in facilitating corporate filings,[263] and the existence of a corporate Bar available, willing, and able to handle such disputes.

If one focuses more broadly on the corporate governance regime beyond just litigation rights alone, then it becomes even more apparent that courts are ill-equipped to quantify the costs and benefits of one state's corporate governance regime over another's. Under the facts presented here, we should be cautious about second-guessing the judgments of the directors as to how best evaluate and weigh the various competing considerations as such factors might apply to a specific corporation.[264] This is particularly true given that none of these features is static, including the statutory schemes at issue and their related case law developments.[265] We submit that attempting to value competing corporate governance structures, particularly in the absence of any concrete allegations of Defendants receiving a material, non-ratable benefit, and based upon hypothetical future transactions,

---

Law Section--its Council--that develops such initiatives." *Id.* The Council's recommendations must be approved by the full Corporation Law Section and by the Executive Committee of the Bar Association. The Delaware State Constitution requires that amendments to the DGCL require two-thirds of both the state Senate and the House of Representatives before being sent to the Governor. *Id.* at 1753–54.

[263] *See*, *e.g.*, Why Businesses Choose Delaware, https://corplaw.delaware.gov/why-businesses-choose-delaware/ (last visited Jan. 17, 2025) (describing Delaware's Division of Corporations).

[264] *See* Nevada Amicus Br. at 20 (observing that "healthy competition between states allows corporations to make their own value judgments about what corporate governance policy best serves a corporation's needs.").

[265] We note that the Vice Chancellor proposed an analysis based upon changes in stock prices before and after the announcement of such a redomestication. *Palkon*, 311 A.3d at 286; *Palkon v. Maffei*, 2024 WL 1211688, at *4 (Del. Ch. Mar. 21, 2024) (Memorandum Opinion Denying Application For Interlocutory Appeal). Even with a focus on litigation rights alone, such an approach would still be highly uncertain and speculative given the difficulty of isolating the effect of the differing statutory schemes alone, given the presence of other important factors that weigh in the analysis and other variables that could affect the stock price.

as here, would be an unacceptably speculative cost-benefit exercise. Such an exercise, under these circumstances, also risks intruding on the value judgments of state legislators and directors of corporations.

### E. Our Conclusion Aligns With Delaware Policy

Delaware policy has long recognized the values of flexibility and private ordering.[266] Allowing directors flexibility in determining an entity's state of incorporation is consistent with this Delaware policy. Declining to second-guess directors' decisions to redomesticate where there are no well-pled allegations of a material, non-ratable benefit flowing to the directors or controllers furthers this important policy.

### V. CONCLUSION

For the foregoing reasons, we hold that the business judgment rule applies to the present case. Accordingly, we **REVERSE** the judgment below.

---

[266] *See Salzberg v. Sciabacucchi*, 227 A.3d 102, 116 (Del. 2020) ("[T]he DGCL allows immense freedom for businesses to adopt the most appropriate terms for the organization, finance, and governance of their enterprise.").